Milton C. HONSEY, Connie Burchett, Harold H. Hoffmann, Donald L. Huber, Clark Mac Gregor, Glenn G. C. Olson, Stanley W. Olson, Richard J. Parish and Kenneth Wolfe, Plaintiffs,

v.

Joseph L. DONOVAN, Secretary of State of the State of Minnesota, Eugene A. Monick, Auditor of Ramsey County, Minnesota, Robert F. Fitzsimmons, Auditor of Hennepin County, Minnesota, Kenneth W. Campbell, Auditor of Anoka County, Minnesota, Carl D. Onischuk, Auditor of Dakota County, Minnesota, Individually as Auditors of Their Respective Counties and as Representatives of All County Auditors of the State of Minnesota, Defendants.

Donald Sinclair, Rudolph Hanson, William C. Novosad, A. P. Lofgren, Charles Cheney, Richard C. Bergan, S. W. Rodekuhr, Martin L. Vanseth, and David G. Kankel, Intervening Defendants.

No. 4–64–Civ. 169.

United States District Court
D. Minnesota,
Fourth Division.
Dec. 4, 1964.

Vernon E. Bergstrom and Clayton L. LeFevere, of Howard, Peterson, LeFevere, Lefler & Hamilton, Minneapolis, Minn., for plaintiffs.

Walter F. Mondale, Atty. Gen., State of Minnesota, and John F. Casey, Jr., Deputy Atty. Gen., Saint Paul, Minn., for defendant Joseph L. Donovan.

William B. Randall, County Atty., Ramsey County, and Thomas M. Quayle, Asst. County Atty., Ramsey County, Saint Paul, Minn., for defendant Eugene A. Monick.

George M. Scott, County Atty., Hennepin County, Minneapolis, Minn., for defendant Robert F. Fitzsimmons.

Robert W. Johnson, County Attorney, Anoka County, Anoka, Minn., for defendant Kenneth W. Campbell.

J. Jerome Kluck, County Atty., Dakota County, Hastings, Minn., for defendant Carl D. Onischuk.

Gordon Rosenmeier and John E. Simonett, Little Falls, Minn., for intervenors Donald Sinclair and Rudolph Hanson.

William P. Scott, of Scott & Miller, Gaylord, Minn., for intervenor William C. Novosad.

Lyman A. Brink, of Brink & Sobolik, Hallock, Minn., for intervenors A. P. Lofgren, Charles Cheney, Richard C. Bergan, C. W. Rodekuhr, Martin L. Vanseth and David G. Kankel.

Before BLACKMUN, Circuit Judge, DEVITT, Chief District Judge, and NORDBYE, District Judge.

BLACKMUN, Circuit Judge.

This suit, instituted June 4, 1964, is based on those civil rights statutes which are now compiled as 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. § 1343(3) and (4). It challenges the validity of the present apportionment of both houses of the bicameral Minnesota legislature.

The nine plaintiffs are residents and qualified voters of Anoka, Dakota, Hennepin, and Ramsey Counties, respectively; these embrace the State's Twin City metropolitan area. The complaint seeks, among other relief, (a) to have the most recent Minnesota legislative redistricting act, Laws 1959, Ex.Sess., ch. 45, now M.S.A. §§ 2.02 to 2.715, inclusive, de-

clared void and violative of both the equal protection clause of the fourteenth amendment of the Constitution of the United States and the equal-apportion-ment-of-both-houses-by-population requirement[1] of Article IV, § 2, of the Constitution of the State of Minnesota; (b) to restrain the defendant Donovan, who is the Minnesota Secretary of State, and the other defendants, who are the auditors of the four named counties, individually and as representatives of all other Minnesota county auditors, from performing acts necessary for the election of members of the state legislature, under the existing statutes, until the legislative districts have been properly reapportioned; and (c) to direct that elections for legislators be at large until new and proper apportionment legislation has been enacted. The defendants by their answer ask that the suit be dismissed or, in the alternative, that the court defer action until the adjournment of the forthcoming 1965 regular legislative session.

Inasmuch as the suit is one to restrain the enforcement and execution of Minnesota statutes by a state officer, this three-judge district court was designated. 28 U.S.C. §§ 2281, 2284(1).

The pertinent facts are established by the original parties by admissions in the pleadings and by stipulation. The last of the original briefs was filed on August 26. Shortly after the case was so submitted and before a decision was rendered, intervenors Sinclair and Hanson presented their joint application under Rule 24(a) (2), F.R.Civ.P., for leave to intervene as additional defendants as of right. The application, as authorized by 28 U.S.C. § 2284(5), was promptly heard by Judge Devitt and, with all of us concurring, was granted with permission to the intervenors and the plaintiffs to file

affidavits and additional briefs.[2] By stipulations and with the court's consent, the other seven intervenors named in the title were also permitted to intervene as additional defendants. The last of the second set of briefs was received on October 30.

Intervenors Sinclair and Hanson are, respectively, residents and qualified voters of Marshall and Freeborn Counties, Minnesota. Mr. Sinclair is a Minnesota state senator representing the Sixty-seventh Legislative District consisting of Kittson, Marshall and Roseau Counties in northwestern Minnesota. Mr. Hanson is a Minnesota state senator representing the Ninth Legislative District consisting of Freeborn County in southern Minnesota. Intervenor Novosad is a resident, a qualified voter and the auditor of Sibley County in south central Minnesota. Intervenors Lofgren, Cheney, Bergan, Rodekuhr, Vanseth, and Kankel are the respective auditors of the six counties of Kittson, Marshall, Roseau, Pennington, Polk, and Red Lake, comprising the northwestern corner of the State.

Although the complaint requested injunctive relief, this aspect of the case, so far as the 1964 elections for the Minnesota House were concerned, was not seriously pressed upon us. Indeed, the plaintiffs by their brief stated that they did not "insist" that the 1964 candidates run at large. In view of this partial concession and in view of the lateness of the hour when the complaint was filed, we deemed it both unnecessary and undesirable to interfere with the then pending and now immediately past primary and general elections. Reynolds v. Sims, 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Those elections have taken place in due course.

---

1. "The representation in both houses shall be apportioned equally throughout the different sections of the State, in proportion to the population thereof, exclusive of Indians not taxable under the provisions of law."

2. Despite the fact that this and the other applications for intervention were filed only after the case had been submitted, we concluded that, under all the circumstances, the Rule's requirement of timeliness was satisfied. Kozak v. Wells, 278 F.2d 104, 109 (8 Cir. 1960).

*The earlier Minnesota reapportionment case.* A suit similar to this one and for like relief, and alleging deprivation of rights guaranteed by the fourteenth amendment, was instituted in this court in 1957 against the defendant Donovan, two of the same county auditors, and others. It attacked the Minnesota legislative apportionment effected by Laws 1913, ch. 91. The 1913 Act was then still in effect even though the Minnesota Constitution, art. IV, § 23, calls for reapportionment at the first legislative session after each federal census.[3] The statutory three-judge federal court designated to hear that case recognized "the unmistakable duty of the State Legislature to reapportion itself periodically in accordance with recent population changes", noted that the legislature was then soon to be elected in its entirety and was to convene in early January 1959, and observed that "It is not to be presumed that the Legislature will refuse to take such action as is necessary to comply with its duty under the State Constitution." Although retaining jurisdiction, the court deferred decision on the issues "in order to afford the Legislature full opportunity to 'heed the constitutional mandate to redistrict.' " Magraw v. Donovan, 163 F.Supp. 184, 187–188 (D. Minn.1958).

Pending this deferral of decision, the 1959 Minnesota legislature effected the State's current apportionment which, as the original parties by the pleadings concede, is "based, somewhat, on the 1950 federal census". Thereafter the plaintiffs in the 1957 suit moved, under Rule 41(a) (2), F.R.Civ.P., to dismiss that action without prejudice. Judge Bell granted that motion. Magraw v. Donovan, 177 F.Supp. 803 (D.Minn.1959).[4]

■ *The federal constitutional development.* Since the enactment of the 1959 statute and since the termination of the Magraw litigation the federal constitutional picture has been brought into focus and greatly clarified. The United States Supreme Court, in a series of now well-known decisions, has taken positive action with respect to the federal constitutional aspects of state legislative districting. The first three cases, decided near the end of the Court's 1961 term, were Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), Scholle v. Hare, 369 U.S. 429, 82 S.Ct. 910, 8 L.Ed.2d 1 (1962), and WMCA, Inc. v. Simon, 370 U.S. 190, 82 S.Ct. 1234, 8 L.Ed.2d 430 (1962). A detailed analysis of those cases and of their respective procedural approaches is not necessary here. It suffices merely to say that, among other things, they established (a) that the very civil rights statutes invoked by the plaintiffs here afford a United States district court jurisdiction over a claim of alleged federal unconstitution-

---

3. Section 23 reads:
 "The legislature shall provide by law for an enumeration of the inhabitants of this State in the year one thousand eight hundred and sixty-five, and every tenth year thereafter. At their first session after each enumeration so made, and also at their first session after each enumeration made by the authority of the United States, the legislature shall have the power to prescribe the bounds of congressional, senatorial and representative districts, and to apportion anew the senators and representatives among the several districts according to the provisions of section second of this article."
 Despite the apparent limiting character of this language, the section has been construed to mean that the legislature has the duty, not merely the power, to reapportion after a census, and that if this step is not taken at the first session after the census, it may be taken at a subsequent session. State ex rel. Meighen v. Weatherill, 125 Minn. 336, 341, 147 N.W. 105, 107 (1914). In Smith v. Holm, 220 Minn. 486, 490, 19 N.W.2d 914, 916 (1945), the Minnesota court also noted that "The responsibility to heed the constitutional mandate to redistrict is laid upon the legislature * * *." This language was quoted with approval in State ex rel. LaRose v. Tahash, 262 Minn. 552, 558, 115 N.W.2d 687, 691 (1962), appeal dismissed, 371 U.S. 114, 83 S.Ct. 172, 9 L.Ed.2d 168.

4. For other aspects of the same litigation see Magraw v. Donovan, 159 F.Supp. 901 (D.Minn.1958), and Rosso v. Magraw, 288 F.2d 840 (8 Cir. 1961).

ality of state legislative districting; (b) that plaintiffs who are qualified to vote for members of a state legislature have standing to sue; and (c) that, in the setting of those cases, an allegation of a denial of the equal protection of the laws under the fourteenth amendment presents a justiciable constitutional cause of action. Clearly, these cases establish the jurisdiction of this court for the present action, the present plaintiffs' standing to sue, and the existence here of a justiciable controversy.

This trilogy was followed by Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), which concerned the constitutionality of the use of Georgia's county-unit system in a primary election for the nomination of a United States Senator and state-wide officers and is the source, p. 381, 83 S.Ct. 809, of Mr. Justice Douglas' pronouncement, in a majority setting, of the "one person, one vote" concept, and by Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed. 2d 481 (1964), which concerned the Georgia statute apportioning the state's congressional districts and is the source, p. 20, 84 S.Ct. p. 536 of Mr. Justice Harlan's statement in dissent, "I had not expected to witness the day when the Supreme Court of the United States would render a decision which casts grave doubt on the constitutionality of the composition of the House of Representatives." These two decisions perhaps contained the first definite indications of the Supreme Court's current attitude as to the merits of the apportionment-constitutional issue.

Then came the six cases of June 15, 1964, decided, in fact, after the institution of the present lawsuit. These were the Alabama case of Reynolds v. Sims, supra, 377 U.S. 533, 84 S.Ct. 1362; the New York case of WMCA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568; the Maryland case of Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595; the Virginia case of Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609; the Delaware case

of Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620; and the Colorado case of Lucas v. Forty-fourth General Assembly, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632. One week later nine other pending cases were remanded, per curiam, for further proceedings in the light of Reynolds v. Sims and its companions. Swann v. Adams, 378 U.S. 553, 84 S.Ct. 1904, 12 L.Ed.2d 1033 (Florida); Meyers v. Thigpen, 378 U.S. 554, 84 S.Ct. 1905, 12 L.Ed.2d 1024 (Washington); Nolan v. Rhodes, 378 U.S. 556, 84 S.Ct. 1906, 12 L.Ed.2d 1034 (Ohio); Williams v. Moss, 378 U.S. 558, 84 S.Ct. 1907, 12 L.Ed.2d 1026 (Oklahoma); Germano v. Kerner, 378 U.S. 560, 84 S.Ct. 1908, 12 L.Ed.2d 1034 (Illinois); Marshall v. Hare, 378 U.S. 561, 84 S.Ct. 1912, 12 L.Ed.2d 1036 (Michigan); Hearne v. Smylie, 378 U.S. 563, 84 S.Ct. 1917, 12 L.Ed.2d 1036 (Idaho); Pinney v. Butterworth, 378 U.S. 564, 84 S.Ct. 1918, 12 L.Ed.2d 1037 (Connecticut); Hill v. Davis, 378 U.S. 565, 84 S.Ct. 1918, 12 L.Ed.2d 1037 (Iowa).

Here, too, it is not necessary for us to discuss in detail the six cases' factual differences. Their holdings and implications, despite the presence of vigorous dissent, are clear. So far as pertinent for the present case, the majority opinions, all written by Mr. Chief Justice Warren, hold:

1. The equal protection clause of the fourteenth amendment requires substantially equal legislative representation for all citizens of a state. This is the basic concept.

2. "[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." Reynolds v. Sims, p. 577 of 377 U.S., p. 1390 of 84 S.Ct.

3. But "Mathematical exactness or precision is hardly a workable constitutional requirement." Reynolds v. Sims, p. 577 of 377 U.S., p. 1390 of 84 S.Ct. And "it is neither practicable nor desirable to establish rigid mathematical

standards * * *. Rather, the proper judicial approach, is to ascertain whether * * * there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination." Roman v. Sincock, p. 710 of 377 U.S., p. 1470 of 84 S.Ct.

4. "So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible * * *." Reynolds v. Sims, p. 579 of 377 U.S., p. 1391 of 84 S.Ct.

5. However, weighting of votes according to area is discriminatory. A "built-in bias against voters living in the State's more populous counties" does not meet constitutional standards. WMCA, Inc. v. Lomenzo, p. 654 of 377 U.S., p. 1428 of 84 S.Ct. Also, "neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes." [footnote omitted]. Reynolds v. Sims, pp. 579–80 of 377 U.S., p. 1391 of 84 S.Ct.

6. Any reliance on either the federal Senate and House analogy or on the Federal Electoral College analogy is misplaced.

7. A state "can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is maintained" and "provide for compact districts of contiguous territory". But in so doing population must not be "submerged as the controlling consideration in the apportionment of seats in the particular legislative body". Reynolds v. Sims, pp. 580, 578, and 581 of 377 U.S., pp. 1391, 1390, 1392 of 84 S.Ct.

8. "It is simply impossible to decide upon the validity of the apportionment of one house of a bicameral legislature in the abstract, without also evaluating the actual scheme of representation employed with respect to the other house." Maryland Committee for Fair Representation v. Tawes, p. 673 of 377 U.S., p. 1451 of 84 S.Ct.

9. A state may, consistently with the equal protection clause, provide for only periodic revision of its reapportionment scheme. Decennial reapportionment "would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation." But reapportionment accomplished with less frequency "would assuredly be constitutionally suspect." Reynolds v. Sims, 377 U.S. pp. 583–584, 84 S.Ct. p. 1393.

10. "Where a federal court's jurisdiction is properly invoked, and the relevant state constitutional and statutory provisions are plain and unambiguous, there is no necessity for the federal court to abstain pending determination of the state law questions in a state court." Davis v. Mann, p. 690 of 377 U.S., p. 1460 of 84 S.Ct.

11. A court "should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible." Reynolds v. Sims, p. 584 of 377 U.S., p. 1393 of 84 S.Ct.

12. Reapportionment "is primarily a matter for legislative consideration and determination, and * * * judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." Reynolds v. Sims, p. 586 of 377 U.S., p 1394 of 84 S.Ct. Retention of jurisdiction may be appropriate.

*The Minnesota facts.* With these principles in mind, we turn to Minnesota's facts as established by the pleadings, the stipulation, the State's Constitution, and the 1959 Act:

By statute (not by its Constitution) the State is divided into "67 senatorial

and representative districts". M.S.A. § 2.03. Each district elects one senator. Most districts elect two representatives, but five elect only one and six elect three. This makes a total of 67 senators and 135 representatives. In 17 districts the plural representatives run at large. Every other district which has more than one representative is geographically subdivided. M.S.A. §§ 2.02, 2.04–2.70. Each house district falls entirely within or is congruent with a senate district and does not overlap another senate district. This meets the state constitutional requirement, art. IV, § 24, that senators shall "be chosen by single districts of convenient contiguous territory * * * and no representative district shall be divided in the formation of a senate district." Although not required by the state Constitution, county lines have been utilized generally in the formulation of districts.[5]

Senators serve a 4-year term. Inasmuch as all senators were elected in 1962, they were not up for election in 1964 but, instead, serve until the first Monday in January 1967. House members serve a 2-year term. The present representatives hold their offices until the first Monday in January 1965. Minn. Const. art. IV, § 1, and art. VII, § 9. New house members, therefore, were chosen in the recent 1964 election. They assume office January 4, 1965.

In the century which elapsed between the 1857 Minnesota Constitutional Convention and the 1959 Act the State's legislative districts were reapportioned generally seven times, namely, in 1860, 1866, 1871, 1881, 1889, 1897, and 1913. The 1959 Act was thus the eighth reapportionment, but it was the first in 46 years. Because the 1959 Act by its terms, M.S.A. § 2.71, did not go into effect until 1962 and thus affected only the 1962 election and those thereafter, the federal census of 1960 became due and was made in the interim. The Minnesota legislature's regular sessions of 1961 and 1963 and the two extra sessions of 1961 were held after that census. The 1959 Act was not amended at any of those sessions and no redistricting based upon the 1960 census has ever yet been effected.

The population of Minnesota increased 14.5% between the 1950 census and that of 1960. This increase was not uniform throughout the state's 87 counties. The increases in the counties in which the respective plaintiffs reside varied from 18.9% (Ramsey) to 141.5% (Anoka). The plaintiffs' four counties were among the nine with the greatest increases.

According to the 1960 federal census the population of Minnesota was 3,413,-864. This number, divided by the number of senate districts (67) produces a figure of 50,953. When this population is divided by the number of house districts (135), a figure of 25,288 results. Based strictly on the 1960 population figure these are the average or "ideal" numbers for the senate and house districts.

Also, according to the 1960 census, the populations of the senate districts range from 100,520 to 24,428. Thus the largest district in population (the Thirtieth, in suburban Hennepin County) has almost twice the average figure; the smallest (the Thirty-eighth, in the City of Minneapolis and also in Hennepin County) has less than half the average figure. The smallest, too, has less than one-third of the population of each of the seven largest districts. The second smallest (the Sixty-fifth) has less than

5. Exceptions as to both Senate and House are (a) the metropolitan counties of Hennepin (Thirtieth District to Forty-second District, inclusive) and Ramsey (Forty-third District to Forty-ninth District, inclusive); (b) the Third and Fourth Districts of Wabasha and Olmsted Counties; (c) the Twenty-sixth, Twenty-seventh and Twenty-eighth Districts, with their problem occasioned by the multi-county location of the City of Saint Cloud; (d) the Fifty-ninth, Sixtieth, Sixty-second, and Sixty-third Districts in Saint Louis County; and (e) the Sixty-first District of Cook and Lake Counties and part of Saint Louis County. Exceptions as to the House alone exist in the Second, Fifth, Eleventh, and Thirteenth Districts.

one-third of the population of each of the five largest districts. Each of the third and fourth smallest (the Third and Twenty-ninth) has less than one-third of the population of each of the two largest. The population ratio of each of the five largest to each of the nineteen smallest is over two to one. The same ratio applies between each of the nine largest and the ten smallest. The following ratios represent the population of each of the five districts where six of the plaintiffs reside (two plaintiffs live in the Thirty-first) as compared to the population of one of the adjoining or corner-touching districts: 100,520:24,428 (Thirtieth to Thirty-eighth); 93,919:-41,815 (Thirty-second to Twelfth); 85,916:29,935 (Fifty-first to Twenty-ninth); 78,303:33,035 (Thirteenth to Sixth); 75,637:29,935 (Thirty-first to Twenty-ninth).

The populations of the house districts range from 56,076 to 8,343. Thus the ratio of the largest (the Forty-third North) to the smallest (Kittson County in the Sixty-seventh) is nearly 7 to 1. The ratio of the five largest to the three smallest is over 5 to 1. The ratio of the thirteen largest to the sixteen smallest is over 3 to 1. The ratio of the twenty-five largest to the thirty-three smallest is over 2 to 1. The largest district has over twice the average figure. The smallest has less than one-third of that average. The Forty-third District, divided into North and South, has more than double the number of people in the North than in the South. The same is true of the divided Forty-eighth; as between the City of Austin and Dodge County in the Fifth; as between Nobles County and Rock County in the Nineteenth; as between Lincoln County and Lyon County in the Twentieth; as between Swift County and Kandiyohi County in the Twenty-third; as between Aitkin County and Carlton County in the Fifty-second; as between Clay County and Wilkin County in the Fifty-sixth; as between Becker County and Hubbard County in the Fifty-seventh; and as between Itasca County and Cass County in the Fifty-eighth. Some of these more-than-2-to-1 ratios existed under the figures of the 1950 census.

It is stipulated that the disparity of populations of the legislative districts, as shown by the 1960 census, continues to the present time.

If one uses the 1960 figures, then one may say that, in 1962, a majority of the state's population was represented by only 26 senators, or 38.8% of the 67 seats, and by only 48 representatives, or 35.5% of the 135 seats. Stating this in reverse, the 34 smallest senatorial districts were represented by the majority of the Senate but contained only 39.1% of the population. The 68 smallest House districts were represented by a majority of the House but contained only 35% of the population.[6]

The affidavits filed in connection with the interventions refer to other undisputed facts. We mention these even though the relevancy of some of them may well be questionable.

There were reapportionment discussions and activity, within the Minnesota legislature and outside it, not only during the 1959 regular and extra sessions, but, as well, in the regular sessions of 1955 and 1957 and the extra session of 1957. A number of bills were introduced. Some reached advanced stages in the legislative process but none was enacted until the 1959 statute. As a definite companion measure to that Act, the legislature proposed, Laws 1959, Ex. Sess., ch. 47, certain amendments to

6. These statements and figures are to be distinguished from the frequently advanced theoretical proposition that, with equally populated districts, only 26% of the electorate (a bare majority of the voters in a bare majority of the districts) could elect a majority of the legislators. Mr. Justice Stewart referred to this in footnote 12 to his dissent in Lucas v. Forty-fourth General Assembly, supra, p. 750 of 377 U.S., 84 S.Ct. 1459. That theoretical approach rests on the percentage of each district's electorate. Our comments are based on the percentage of the entire population represented by a majority of legislators.

Article IV of the Minnesota Constitution. Included were fixed maximums of members in both the senate and the house; representation in the house "on the basis of equality according to population"; representation in the senate "in a manner which will give fair representation to all parts of the state"; confinement of the percentage representation of the five counties "adjacent to and including the county containing the seat of government of the state" (Ramsey) to 35% of the members of the senate, even though those counties might have 35% or more of the State's total population; and a mandatory extra session for reapportionment purposes whenever reapportionment was not effected at the first regular session after a decennial census. These amendments were submitted in due course to the state's electorate in 1960 but failed to pass.

The legislature was aware of its duty to reapportion. The Legislative Research Committee, created under M.S.A. § 3.31, made its report on relevant apportionment factors in the 1950's. There was a Citizen-Legislator Committee on Reapportionment appointed by the governor in late 1957 to recommend a reapportionment program. Its report was available for the 1959 sessions. The legislature in 1959 was aware of estimated population increases since the 1950 census and by the 1959 Act gave some recognition to increases in the more rapidly growing areas of suburban Hennepin County, Ramsey County, Rochester and its suburbs, Mower County, Anoka County, Washington County, and the City of Saint Cloud.

*The intervenors' position.* The intervenors argue that "the factual environment of none of the Reapportionment Cases is present here"; that "There is no pattern of discrimination which by any test, or by dictionary definition, can be called invidious or arbitrary, notwithstanding obvious population differences"; that "Use of county lines for single county, multi-county districts, or multi-district counties, has been a practical necessity in apportionment to avoid the governmental awkwardness of dividing county government between senatorial districts and multiple representative districts"; that "Minnesota's 1959 reapportionment enactment was a rational plan, designed on county and other governmental subdivision lines, which afforded adequate and substantially equal representation to all parts of the state without sacrificing the equal-population concept, was wholly devoid of invidious discrimination against any area of the state or any population segment, and anticipated in spirit and letter the mandate of Reynolds"; that "Apportionment in Minnesota has followed the almost universal practice in the United States of using the county structure of the state, a practice benignly looked upon by the Court in Reynolds"; that "There was no adjusting of representation to favor rural counties as such or disfavor urban areas as such, nor were suburban districts as such discriminated against"; that "Apportionment to counties in this fashion, based on population, is grounded on the realistic premise that counties are the smallest territorial units to which apportionment can be made rationally"; that "it is important that the measure be seen as redistricting carefully planned and in good faith designed to comply with constitutional requirements"; that the 1959 reapportionment was not based on the 1950 population but "the population of that census was adjusted to what was believed by the evidence presented to the committees to be the actual 1959 population distribution, i. e., the distribution reflected later in the 1960 census"; that "Federal constitutional command should be deemed met by redistricting next according to the 1970 census inasmuch as the 1959 Act was valid when passed"; that apportionment to the plaintiffs' counties as a whole is "demonstrably adequate by con-

stitutional standards"; that in the metropolitan centers each county voter, in effect, has a number of senators and representatives speaking for him "on any parochial interest of legislative stature"; that "it has not been said that a federal court should take cognizance of a local contention that constitutional inequality is alleged because a complainant's district in Minneapolis has more people than another district in the same city, or because a suburban complainant has discovered a district in his county seat and core city has fewer people than his"; that "there could be no question if the same apportionment called for an at-large election" in the county; that there was no complaint to the legislature that any plaintiff's district was inequitably treated when the 1959 Act was passed; and that it has become "common thinking" to allow a variation, which equates with a 1½ to 1 ratio, of 20% from the average population per district.

It is to be noted (a) that this argument clearly concedes the existence of "obvious population differences"; (b) that it stresses the use of county lines "as a practical necessity"; (c) that at the same time it recognizes, as it must, that exceptions do exist under the 1959 Act in that some counties find themselves allocated to more than one senatorial district; and (d) that it seeks to overcome any intra-county population discrepancy by the approach (which strikes us as one resting not essentially on fact but on concepts of political theory) that the voter in the multiple-district county really has multiple representation in the legislature and that, therefore, a within-the-county population discrepancy is of no constitutional consequence.

We need not consider the "state of mind" of the legislature or of individual members thereof in the formulation and passage of the 1959 Act. Neither do we need to consider any question of basic good faith in the enactment of that legislation or, indeed, any question of the validity of the 1959 Act as of the time of its passage. We do not impugn the legislature's motive and we may assume that it acted in good faith. But all this does not render the 1959 Act, based, as it was, on the 1950 census updated, impervious to federal constitutional attack on facts which exist five years later in 1964.

The admitted legislative district population figures, both senate and house, clearly demonstrate, it seems to us, first, that the plaintiffs have sustained their burden of proof, Thigpen v. Meyers, 211 F.Supp. 826, 832 (W.D. Wash.1962), affirmed on the merits and remanded, 378 U.S. 554, 84 S.Ct. 1905; Mann v. Davis, 213 F.Supp. 577, 584, (E.D.Va., 1962) affirmed on the merits and remanded, 377 U.S. 678, 84 S.Ct. 1441, and, second, that the 1959 apportionment presently violates the equal protection clause of the fourteenth amendment and fails to meet the minimal standards promulgated by the United States Supreme Court in the several recent cases which have been cited. Those standards, of course, are binding upon the Minnesota legislature, are binding upon us as a federal court and would be equally binding upon a Minnesota court if this litigation were in a state tribunal. Maryland Committee for Fair Representation v. Tawes, supra, p. 674 of 377 U.S., 84 S.Ct. 1429.

The Minnesota Constitution, as has been noted, relates representation in both houses solely to population. We therefore are not confronted here with the situation, present in some cases, where the applicable state statute or consitutional provision recognizes factors other than population. But the disparities in population-representation apparent from the Supreme Court's opinions, even accepting in each the most favorable plan under consideration, reveal that the present Minnesota apportionment falls short of the prescribed

standards and is not legitimatized by proper "considerations incident to the effectuation of a rational state policy". Thus we have:

| State and case | Population variance (upper and lower house) | Percentage represented by majority (upper and lower house) |
|---|---|---|
| Alabama, Reynolds v. Sims | 20–1 and 5–1 | 27.6% and 37% |
| New York, WMCA, Inc. v. Lomenzo | 3.9–1 and 21–1 | 41.8% and 34.7% |
| Maryland, Maryland Committee for Fair Representation v. Tawes | 34–1 and 6–1 | 14.1% and 35.6% |
| Virginia, Davis v. Mann | 2.65–1 and 4.36–1 | 41.1% and 40.5% |
| Delaware, Roman v. Sincock | 15–1 and 12–1 | 21% and 28% |
| Colorado, Lucas v. Forty-fourth General Assembly | 3.6–1 and 1.7–1 | 33.2% and 45.1% |

---

These compare, as above noted, with Minnesota population variances of 4 to 1 and almost 7 to 1 and majority representation percentages of 39.1% and 35%. The Virginia discrepancies in all respects were less than those of Minnesota and would be less still if, as was urged, the large number of military personnel in that state were not taken into account. Yet, in Davis v. Mann, supra, p. 691 of 377 U.S., p. 1460 of 84 S.Ct. it was held that the "state legislative malapportionment, whether resulting from prolonged legislative inaction or from failure to comply sufficiently with federal constitutional requisites, although reapportionment is accomplished periodically, falls * * * within the proscription of the Equal Protection Clause." That case flatly controls this one, not only in its holding, but upon its facts.

The intervenors would assert, however, that, while there are population variances in Minnesota under the 1959 Act, these result from "no pattern of discrimination against any part of the state or in favor of any part of the state" and "no design to dilute the vote of the people of any area". They point out that some of the least populated Minnesota districts are in the metropolitan area but others are spread all over the state and that some rural areas are also among the most populated districts. It is suggested that Reynolds v. Sims and its companion cases have, as an essential element, "a deliberate weighting of the votes of the citizens of one area against those of another area".

We do not read the June 1964 cases so narrowly and we feel that they are not so easily to be explained away. It is true, of course, that the Supreme Court, as we have pointed out, did say that weighting of votes according to area is discriminatory. But the decisions are far broader than that in their holdings and in their implications. They are concerned with discrimination against individual citizens and groups of citizens and are not confined to discrimination against one type of area or one type of economic or interest group. We repeat that those cases stress equal legislative representation for all citizens and apportionment substantially on a population

basis. Failure to meet these standards is improper discrimination. This is so whether the discrimination is against both urban and rural areas, or against only one. A specific pattern of area discrimination is not necessary. Discrimination against some urban areas is not justified because of the simultaneous existence of discrimination against some rural areas. Discrimination is discrimination, wherever it exists and in whatever form it assumes.

 The intervenors' argument that population variances among districts in the same county have no significance in the determination of constitutionality also merits mention. We find it unpersuasive because, first, the variances evident from the facts before us are not confined to districts within a multi-district county. Thus, for example, the population variance between the Thirtieth District in Hennepin County and the Sixty-fifth District of Norman, Mahnomen and Clearwater Counties is 3.8 to 1. But we also feel that the principles enunciated by the Supreme Court do not stop short in their application at the county line and that it cannot be said that, so long as the county as a whole has an acceptable proportion of legislators, it makes no difference how the intra-county districts are themselves composed. Only slight imagination reveals the extremes to which this approach could take us. The more than 4 to 1 variation between the Hennepin County Thirtieth District and the Hennepin County Thirty-eighth District is an illustration. Neither does the suggestion that a county's legislators could be required to run at large and thereby become invulnerable to constitutional attack lend weight. The same suggestion could also be made as to a state as a whole; despite this, the decisions of June 1964 were rendered. If apportionment is attempted, it must be proper throughout.

 We feel—and we are aware that we are repeating when we say this—

that what is important here is equality of representation; that inequality in representation in both houses of Minnesota's legislature must be avoided so far as practicable; that this is what is meant by the "one person, one vote" concept; and that a situation where one senator represents over 100,000 people and another senator represents only 24,428, is not one of acceptable equality but is, instead, improperly discriminatory. This is not a matter, so far as this court is concerned, of basic contest between densely populated metropolitan centers, on the one hand, and the less populated areas, on the other, or between cities and rural communities, or between political parties. No one in this day would argue that Citizen X should be entitled to 4 votes in a gubernatorial election but Citizen Y should be entitled to only one. Yet this is not significantly different from the situation where Citizen X must participate with 100,000 others in the election of one state senator, but Citizen Y may participate with only 25,000 others in the election of another state senator. It is in this light and in this respect that apportionment becomes a matter of concern under the equal protection clause of the fourteenth amendment of the United States Constitution. Reynolds v. Sims, supra, pp. 562–63 of 377 U.S., 84 S.Ct. 1362.

 We should also add a word about the youthful character of the 1959 Act. We recognize that, as the intervenors point out, the last Minnesota apportionment was evolved only a little over five years ago and that the Act became effective only in 1962, less than three years ago. It is then suggested that, since the 1959 Act rested on updated 1950 census figures, reapportionment this soon is not constitutionally demanded until, even, 1970. We doubt if reapportionment may be effected only near the end of the decennial period between censuses and may thereby assume a mantle of validity for another decade.[7] One might wonder, also, why the 1959 Act

---

7. The Minnesota constitutional provision quoted in footnote 3, supra, would itself seem to contraindicate this.

was not made promptly effective, rather than deferred until after the 1961 elections. We are not sure, as has been suggested, that this was required by the last clause of Article IV, § 24, of the State's Constitution.[8] That provision would seem to require an election of senators at the very next election following reapportionment, even though four years had not elapsed since their last election, rather than to prohibit an election until the four year term had been completed. In any event, we are confronted here with the facts of 1964 and with the interim decisions of the United States Supreme Court which are clear in their import and direct in their mandate. On the present facts the comparative youth of the 1959 Act does not preserve its validity.

This determination of federal unconstitutionality is all that the present case requires. Although the complaint also asserts violation of the Minnesota Constitution, we need not meet that issue even if we were to conclude that this court had the power and were an appropriate tribunal so to do.

 This brings us to the question of remedy. Although the existing Minnesota apportionment plan is invalid, as we here determine, equitable considerations in the aggregate demand that we withhold at this time the requested injunctive relief. We have every confidence that the Minnesota legislature will fulfill its constitutional obligations and, at the forthcoming 1965 regular session (limited by law to 120 legislative days, Minn.Const. art. IV, § 1), will enact appropriate reapportionment legislation effective forthwith, that is, for the 1966 and subsequent elections. We are confident, too, that this can be done without conflict with present Minnesota constitutional provisions even though county lines may have to be respected less strictly, but without gerrymandering, than has been the case in the past. The com-

ing session will provide the legislature, to use the words of Reynolds v. Sims, p. 586 of 377 U.S., 84 S.Ct. 1362, with "an adequate opportunity" to reapportion "in a timely fashion". If the legislature fails to fulfill its constitutional reapportionment duty at its 1965 regular session, then more direct judicial relief may become appropriate.

 The details of redistricting we recognize as basically and primarily a legislative responsibility. Reynolds v. Sims, supra, p. 586 of 377 U.S., 84 S.Ct. 1362; Maryland Committee for Fair Representation v. Tawes, supra, p. 676 of 377 U.S., 84 S.Ct. 1429. The applicable standards are evident from the six Supreme Court opinions of June 15, 1964. We have endeavored to list, in summary form above, those standards which are pertinent here. We emphasize and repeat, for what assistance it may provide, that among the established guidelines are the following: substantially equal legislative representation is the base; mathematical exactness is not a workable constitutional requirement; there may be present an element, but not the governing one, resting upon the integrity of political subdivisions and other legitimate considerations incident to the effectuation of a rational state policy; this element, however, must be free from arbitrariness or discrimination; neither history alone, nor economic or other group interests are factors which justify disparities from population-based representation; political subdivisions may be accorded some independent representation in at least one house so long as the basic standard of equality of population among districts is maintained; weighting of votes according to residence is discriminatory; and there must be no "built-in bias".

We add the following conclusionary comments:

1. We are not unaware of the anomaly which seems to be present in allowing

---

8. "[A]and thereafter senators shall be chosen for four years, except there shall be an entire new election of all the sena-

tors at the election of representatives next succeeding each new apportionment provided for in this article."

and expecting an improperly constituted or "de facto" legislature to proceed to enact reapportionment legislation. This, however, is a practical fact which exists and which must be faced. The Supreme Court has recognized the propriety of reapportionment by just such a body. Reynolds v. Sims, supra, p. 585 of 377 U.S., 84 S.Ct. 1362. We, of course, do no less. See League of Nebraska Municipalities v. Marsh, 232 F.Supp. 411, 414 (D.Neb.1964).

2. We know that it is very easy to criticize an existing apportionment and that, in contrast, it is not easy to formulate a plan which will not only meet constitutional standards but which will prove so acceptable to an existing legislature as a whole as to result in formal approval of that plan by that legislature. By our holding in this case we have endeavored, and certainly have intended, not to be destructively critical in any way.

3. Reapportionment is a problem common to all states today. Many of our states, perhaps most, are going through the throes of reapportionment in one manner or another. The problem is not Minnesota's alone. It will be solved and, as we have stated, we are confident that it will be solved promptly and effectively at the forthcoming session. As the intervenors have noted, the topic is a lively one and helpful and worthwhile suggestions are already being evolved and are available from a number of official and other responsible sources.

4. It is theoretically possible, of course, if country-to-city trends continue to the extreme, for a state conceivably to be reduced to only one legislative district for its territory apart from its metropolitan areas, and with all remaining districts in the cities. This, however, is a problem to be considered and resolved in another day.

5. The Supreme Court has agreed to hear the appeal (No. 178) in the case of Dorsey v. Fortson, 228 F.Supp. 259 (N.D.Ga.1964). This concerns the validity of a Georgia statute requiring county-wide election of senators in multi-district counties but unitary elections elsewhere. The trial court held that this was violative of the fourteenth amendment. The Supreme Court's decision in that case may come down before Minnesota's 1965 regular legislative session is completed. The existence of the Georgia case indicates that a problem might possibly be present in connection with multi-legislator districts. This will be kept in mind as Minnesota reapportionment progresses.

This memorandum constitutes the findings of fact and the conclusions of law required by Rule 52(a), F.R.Civ.P. Jurisdiction of the case is retained.