Flora **DUNGAN**, also known as Flora Oncken, and C. W. Woodbury, M. D., Plaintiffs,

v.

Grant **SAWYER**, Governor of the State of Nevada, John Koontz, Secretary of the State of Nevada, Paul Laxalt, Lieutenant Governor of the State of Nevada, Michael Mirabelli, Treasurer of the State of Nevada, and Members of and the Legislature of the State of Nevada, Defendants.

Civ. No. 695.

United States District Court
D. Nevada.

March 21, 1966.

Boyd & Leavitt, Las Vegas, Nev., for plaintiffs.

Harvey Dickerson, Atty. Gen. of Nevada, Carson City, Nev., Vargas, Dillon, Bartlett & Dixon, Reno, Nev., Alvin N. Wartman, G. William Coulthard, Las Vegas, Nev., for defendants.

Before BARNES, Circuit Judge, and FOLEY, Jr. and THOMPSON, District Judges.

PER CURIAM.

In its opinion filed September 23, 1965, D.C., 250 F.Supp. 480, this Court held that certain provisions of Nevada's constitution and statutes pertaining to legislative apportionment violated the equal protective clause of the Fourteenth Amendment of the Constitution of the United States and were invidiously discriminatory, being based upon no constitutionally valid policy. The Court ordered the Governor of Nevada to convene a special session of the Legislature for the sole purpose of constitutionally apportioning the Senate and Assembly.

In special session, the legislature passed, and the Governor approved, Chapter 2, Statutes of Nevada, 1965 Special Session, to become effective June 1, 1966, if approved by this Court.

The State Attorney General, appearing for the defendant state executive officers and a number of defendant legislators has petitioned the Court to approve Chapter 2. Counsel for the other defendant legislators support the petition of the Attorney General. The petition sets forth Chapter 2 as Exhibit A thereto, and as Exhibit B, certain facts and figures in explanation of Chapter 2. The Plaintiffs admit the accuracy of the facts contained in Exhibit B to the petition, but urge the Court to reject Chapter 2, contending that this reapportionment plan does not meet the test set forth in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, in that the population of the districts created by the Act are not as equal as practicable.

The general principles that must guide us in determining whether or not Chapter 2 is constitutionally permissive are to be found in six cases decided by the Supreme Court in June of 1964. Reynolds v. Sims, supra; WMCA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568; Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595; Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609; Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620; and Lucas v. Colorado General Assembly, 377 U.S. 713, 84 S.Ct. 1459, 1472, 12 L.Ed.2d 632.

We adopt, in part, from Honsey v. Donovan, Minn.1964, 236 F.Supp. 8, that court's summary of pertinent points of law:

1. The equal protection clause of the fourteenth amendment requires substantially equal legislative representation for all citizens of a state. This is the basic concept.

2. "[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." Reynolds v. Sims, p. 577 of 377 U.S., p. 1390 of 84 S.Ct.

3. But "Mathematical exactness or precision is hardly a workable constitutional requirement." Reynolds v. Sims, p. 577 of 377 U.S., p. 1390 of 84 S.Ct. And "it is neither practicable nor desirable to establish rigid mathematical standards * * *. Rather, the proper judicial approach is to ascertain whether * * * there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination." Roman v. Sincock, p. 710 of 377 U.S., p. 1458 of 84 S.Ct.

4. "So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible * * *." Reynolds v. Sims, p. 579 of 377 U.S., p. 1391 of 84 S.Ct.

5. However, weighting of votes according to area is discriminatory. A "built-in bias against voters living in the State's more populous counties" does not meet constitutional standards. WMCA, Inc. v. Lomenzo, p. 654 of 377 U.S., p. 1428 of 84 S.Ct. Also, "neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from

population-based representation. Citizens, not history or economic interests, cast votes." Reynolds v. Sims, pp. 579–580 of 377 U.S., p. 1391 of 84 S.Ct.

6. A state "can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is maintained" and "provide for compact districts of contiguous territory". But in so doing population must not be "submerged as the controlling consideration in the apportionment of seats in the particular legislative body". Reynolds v. Sims, pp. 580, 578, and 581 of 377 U.S., pp. 1391, 1390, 1392 of 84 S.Ct.

7. "It is simply impossible to decide upon the validity of the apportionment of one house of a bicameral legislature in the abstract, without also evaluating the actual scheme of representation employed with respect to the other house." Maryland Committee for Fair Representation v. Tawes, p. 673 of 377 U.S., p. 1439 of 84 S.Ct.

8. Reapportionment "is primarily a matter for legislative consideration and determination, and * * * judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." Reynolds v. Sims, p. 586 of 377 U.S., p. 1394 of 84 S.Ct. Retention of jurisdiction may be appropriate.

For illustrative purposes, we set forth an analysis of these cases found in Honsey v. Donovan, supra, 236 F.Supp. at page 19:

| "State and case | Population variance (upper and lower house) | Percentage represented by majority (upper and lower house) |
| --- | --- | --- |
| Alabama, Reynolds v. Sims | 20–1 and 5–1 | 27.6% and 37% |
| New York, WMCA, Inc. v. Lomenzo | 3.9–1 and 21–1 | 41.8% and 34.7% |
| Maryland, Maryland Committee for Fair Representation v. Tawes | 34–1 and 6–1 | 14.1% and 35.6% |
| Virginia, Davis v. Mann | 2.65–1 and 4.36–1 | 41.1% and 40.5% |
| Delaware, Roman v. Sincock | 15–1 and 12–1 | 21% and 28% |
| Colorado, Lucas v. Forty-fourth General Assembly | 3.6–1 and 1.7–1 [1] | 33.2% and 45.1%" |

---

1. "Initially, one house of the Colorado Legislature is at least arguably apportioned substantially on a population basis * * *." Lucas v. Colorado General Assembly, supra, at page 1470 of 84 S.Ct., at page 643 of 12 L.Ed.2d.

Within the guidelines laid down by the Supreme Court, a number of three-judge district courts and state supreme courts have considered three tests as major factors in evaluating state legislative apportionment schemes:

(a) Calculate the population ratio between districts having the largest and the smallest population per representative for each house of the legislature (referred to herein as the maximum population variance ratio);

(b) Determine the minimum percentage of persons in the state who elect a majority in each house of the legislature;

(c) Calculate the percentage of deviation from the result obtained by dividing the population of the state by the number of seats in each house of the legislature.

After applying one or more of the three tests, the courts in the following cases have both approved and disapproved apportionment plans:

In Yancey v. Faubus, Ark., 1965, 238 F.Supp. 290, at 299, the court disapproved a plan where 44% of the population elected a majority of the senate, and in the lower house, the greatest percentage of deviation from the average was 24%.

In Davis v. Cameron, Iowa, 1965, 238 F.Supp. 462, between 44.02% and 48.3% of the population elected a majority of the house and 38.9% of the population elected a majority of the senate; the maximum population variance ratio for the house was 1 to 2.23, and for the senate, 1 to 3.20. The court disapproved, but did indicate that 1 to 2.23 was arguably close under Lucas v. Colorado General Assembly, supra.

In the New York case of WMCA, Inc. v. Lomenzo, 1965, 238 F.Supp. 916, the court approved for the senate a maximum population variance ratio of 1 to 1.15, with 49.4% of the population electing a majority; and for the house, a maximum population variance ratio of 1 to 1.21,

with 49.3% of the population electing a majority.

In Jonas v. Hearnes, Mo., 1964, 236 F. Supp. 699, the court rejected a contention that a deviation from the average by 25% was acceptable.

In Schaefer v. Thomson, Wyo., 1964, 240 F.Supp. 247, the court approved one house, although there was a maximum population variance ratio of 1 to 2.59; 46.36% of the population elected a majority; and the greatest variance from the average was 46.72%.[2]

In League of Nebraska Municipalities v. Marsh, Neb., 1965, 242 F.Supp. 357, the court disapproved of a maximum population variance ratio of 1 to 1.6. The court noted that 11 of 50 districts did not fall within a variation of 15% from the average which the United States House of Representatives has approved as permissible variation from the ideal.

In In Re Apportionment of Michigan State Legislature, June, 1964, 373 Mich. 250, 128 N.W.2d 722, the Michigan Supreme Court approved a plan where 52.5% of the population was needed to elect a majority of the senate and 50.6% of the population was needed to elect a majority of the house.

In Petuskey v. Rampton, Utah, 1965, 243 F.Supp. 365, the maximum population variance ratio for the senate was 1 to 1.74, and in the house, 1 to 1.55. The court inferentially approved, but referred the plan back to the legislature to further narrow disparities.

In Herweg v. Thirty Ninth Legislative Assembly of the State of Montana, Mont., 1965, 246 F.Supp. 454, the court adopted its own temporary plan. Under this plan, in the senate the maximum population variance ratio was 1 to 1.45; in the house, 1 to 1.66; 47.9% of the population was required to elect a majority of the house; and 46.8% of the population was required to elect a majority of the senate. In the house, the greatest variation from the average was 25.12% and in the senate, 20.7%.[2]

2. These figures will not be found in the court's opinion. They are computations made from facts set forth in the opinion.

In Paulson v. Meier, N.D., 1965, 246 F.Supp. 36, the court disapproved a plan where there was a maximum population variance ratio of 1 to 1.39 and the greatest deviation from the average was 19.4%.

In Buckley v. Hoff, Vt., 1965, 243 F. Supp. 873, the court approved a maximum population variance ratio of 1 to 1.35 for the house and 1 to 1.6 for the senate; 48.7% of the population was required to elect a majority of the house and 48.8% of the population was required to elect a majority of the senate.

In Butcher v. Bloom, 1964, 415 Pa. 438, 203 A.2d 556, at page 572, the Pennsylvania Supreme Court states:

"[12] Furthermore, the district court announced that it would not invalidate unequal representation resulting from use of the county as a district, provided that the disparity from the norm does not exceed one-half of a ratio. In our view, the establishment of a rigid mathematical standard is inappropriate in evaluating the constitutional validity of a state legislative apportionment scheme. In Roman v. Sincock, 377 U.S. 695, 710 n. 21, 84 S.Ct. 1449, 1458 n. 21, 12 L.Ed.2d 620 (1964), the Supreme Court pointed out that the lower court in that case had suggested that population-based variance ratios smaller than 1½ to 1 would presumably comport with minimal constitutional requisites, while ratios in excess thereof would necessarily involve deviations from population-based apportionment too extreme to be constitutionally sustainable. The Court said:

'Our affirmance of the decision below is not meant to indicate approval of the District Court's attempt to state in mathematical language the constitutionally permissible bounds of discretion in deviating from apportionment according to population. In our view the problem does not lend itself to any such uniform formula, and *it is neither practica-*

*ble nor desirable to establish rigid mathematical standards* for evaluating the constitutional validity of a state legislative apportionment scheme under the Equal Protection Clause. Rather, *the proper judicial approach is to ascertain whether,* under the particular circumstances existing in the individual State whose legislative apportionment is at issue, *there has been a faithful adherence to a plan of population-based representation,* with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination.' (Emphasis supplied.)"

In Toombs v. Fortson, Ga., 1965, 241 F.Supp. 65, the court disapproved the plan where the maximum population variance ratio in the senate was 1 to 1.81, and in the house, 1 to 2. The greatest variation from the average in the house was 36.93% and 57.11% of the population was required to elect a majority of the house. In that case, the court stated at page 70:

"[3, 4] We decline to set a mathematical formula to be followed but we do hold that a variance of more than 15 percent would be difficult, if not impossible, to justify. It may be that there will be some later elucidation by the Supreme Court on this complex question but until such event occurs, we will base any test as to the reasonableness of variances on the departure figure of 15 percent."

In Silver v. Brown, Cal., 1965, 46 Cal. Rptr. 308, 405 P.2d 132, the California Supreme Court's own provisional plan had a maximum population variance ratio in the senate of 1 to 1.29; in the assembly, of 1 to 1.32; 49.94% of the population was required to elect a majority of the senate and 48.45% of the population was required to elect a majority of the assembly. The greatest variation from the average in the senate was 13.3%, and in the house, was 14.2%. The court, after finding both the senate

and assembly malapportioned, gave the legislature a further opportunity to reapportion itself, otherwise the court's provisional plan would become effective. At page 314 of 46 Cal.Rptr., at page 138 of 405 P.2d, the court stated:

"[6, 7] Although the United States Supreme Court has eschewed establishing rigid mathematical standards for evaluating legislative apportionments (Roman v. Sincock, 377 U.S. 695, 710, 84 S.Ct. 1449, 12 L.Ed.2d 620; Reynolds v. Sims, 377 U.S. 533, 578, 84 S. Ct. 1362, 12 L.Ed.2d 506), we deem it only fair to the Legislature to set forth limits within which an apportionment would at least carry a strong presumption of validity under the equal protection clause and beyond which it would be seriously suspect. Those limits are that no district depart from the ideal size by more than 15 per cent and that a majority of the members of each house be elected by the voters of districts containing at least 48 per cent of the total population. The former figure is that adopted by H.R. 5505 to govern congressional apportionment, which has been passed by the House of Representatives and is now pending in the United States Senate. (See also Toombs v. Fortson (1965) 241 F.Supp. 65, 69–70.) Adherence to the latter figure will insure making districts of maximum deviation the exception rather than the rule."

Nevada's population in 1960 was 285,278 persons. Approximately 75% of the population resided in two counties, approximately 45% in Clark County (Las Vegas) and 30% in Washoe County (Reno).[3]

### Senate

Under Chapter 2, the Nevada State Senate will be composed of 20 senators elected from 13 districts. Based upon a 1960 population of 285,278, the average district would have 14,264 persons per senator. The population per senator ranges from 11,240 for the least populous district to 16,558 for the most populous district. The maximum population variance ratio is 1 to 1.47. The greatest variation from the average is 21.2%, and 49.7% of the population is required to elect a majority, or 11 senators.

Stated another way, 6 districts (14 of the least populous counties, exclusive of Storey County), having a combined population of 72,951, elect 6 senators, 1 for each 12,159 persons. Compared with the ideal or average of 14,264, these 6 districts are 14.7% below the average, and thus they are over-represented by 14.7%.

Three districts (Washoe and Storey Counties), having a combined population of 85,311 (Storey is the least populous county, the 1960 population being only 568 persons) elect 6 senators, or 1 for each 14,219 persons. These 3 districts are .31% under average. This is very close to the ideal or average of 14,264.

Four districts (Clark County), having a population of 127,016, elect 8 senators, or 1 senator for each 15,877 persons. This is 11.3% over the average; hence, these 4 districts are under-represented by 11.3%.

### Assembly

Chapter 2 provides for 16 assembly districts electing 40 assemblymen. The average or ideal population per assemblyman is 7,132 persons. The population per assemblyman ranges from 5,532 for the least populous district to 8,452 persons for the most populous district. The maximum population variance ratio is 1 to 1.53. The greatest variation from the average is 22.4%, and 46.8% of the population is required to elect a majority of the assembly.

3. While the Court judicially notices that since 1960, the Counties of Clark, Washoe, Douglas and Ormsby have experienced substantial increases in population and that Nevada's other thirteen counties have not, we must, in the final analysis, be governed by the only reliable yardstick we have, the 1960 Federal census. That census is the standard against which courts have measured all apportionment plans based on population.

Stated otherwise, 9 districts (14 of the least populous counties, exclusive of Storey County), with a combined population of 72,951, elect 12 assemblymen, 1 for each 6,079 persons, compared with an average or ideal of 7,132. These 9 districts are 14.7% under average, and thus are over-represented by 14.7%.

Two districts (Washoe and Storey Counties), having a combined population of 85,311, elect 12 assemblymen, or 1 assemblyman for each 7,109 persons. This is a variance of .32% from the average. This is very close to the ideal or average.

Five districts (Clark County), having a population of 127,016 persons, elect 16 assemblymen, or 1 for each 7,938 persons. This is 11% over the average and hence these 5 districts are under-represented by 11%.

### Floterial Districts

Chapter 2 provides for 5 floterial districts in the senate and 2 floterial districts in the assembly. The use of floterial districts has been approved by the Supreme Court. Reynolds v. Sims, supra, at page 1390 of 84 S.Ct., at page 537 of 12 L.Ed.2d; Davis v. Mann, supra, note 2, page 1445 of 84 S.Ct., page 615 of 12 L.Ed.2d.

### Conclusion

 Chapter 2 is not the fairest and best plan that the Nevada Legislature could possibly enact. Unquestionably, the Legislature could be reapportioned in a manner so that the population of each district electing senators and assemblymen could be much closer to the average or ideal (see plans suggested in Plaintiffs' answer to the Attorney General's petition). However, this Court may not reject Chapter 2 simply because it believes more equally population-based plans are possible or practicable. What we must decide, here, is whether or not, after considering all of the circumstances existing in Nevada pertinent to legislative apportionment, Chapter 2, viewed as a whole, is constitutionally permissive. If the variation from the average or ideally population-based representation is within permissible limits, we must approve even though there may be other apportionment schemes that would be more nearly population based.

The apportionment under Chapter 2 passes muster when tested by standards or limits which the Supreme Court of California in Silver v. Brown, supra, found would carry a strong presumption of validity under the equal protection clause, to wit, first, that no district depart from the ideal size by more than 15%, and second, that a majority of the members of each house be elected by the voters of districts containing at least 48% of the total population. We accord little weight to the maximum deviations from the average, 21.2% in the senate and 22.4% in the house, because these percentage figures represent only the deviations from the average of one small county district in each house. We think that it is more meaningful to give greater weight to the percentage of variations from the average between the rural and urban counties. Considered from the point of view of rural, vis-a-vis urban counties, with both the senate and assembly considered together those districts comprising 14 of the 15 least populous counties are 14.7% under average. Those districts into which the urban county of Washoe (with the State's least populous county, Storey, added) is divided are very close to the average. Those districts within urban Clark County are approximately 11% over the average. The maximum deviation from the average between those districts composed of 14 of 15 least populous counties and the districts within urban Clark County does not depart from the ideal by more than 15%.

While it is true that in the assembly 46.8% of the population can elect a majority, 49.7% of the population is required to elect a majority of the senate. Considering both houses together, this is substantially equivalent to the limits of 48% established in Silver v. Brown, supra, and is in line with Herweg v. Montana, supra, where, under the court's own

plan, 46.8% of the population was required to elect a majority of the senate and 47.9% of the population was required to elect a majority of the house.

Insofar as the third test employed by the courts in the cases cited supra, the maximum population variance ratios under Chapter 2, 1 to 1.47 for the senate and 1 to 1.53 for the assembly, fall within the limits approved by some of the cases and outside the limits established in other cases.

We find that Nevada's malapportioned, rural-dominated Legislature, ordered by this Court into special session, after much "travail, frustration, boredom, clowning, hard work, hot anger, honest compromise, barely concealed self-interest, enlightened statesmanship and even tears",[4] obviously guided by able legal counsel, has given birth to a plan which this Court cannot say is constitutionally impermissive. While it is quite apparent to the Court that the rural-dominated Legislature gave up no more than it believed it must, this, in itself, does not warrant disapproval. It matters not that the Legislature may have skated upon thin ice and approached dangerously close to the edge of unconstitutional waters.

Viewed as a whole, Chapter 2 is a population-based plan of representation, and this Court cannot say that the deviations from a strict population standard are not based upon legitimate considerations in carrying out rational state policy and this Court cannot say that the plan is tainted with arbitrariness or discrimination or that there is a built-in bias against voters living in the State's most populous counties. We therefore approve Chapter 2, Statutes of Nevada, 1965 Special Session.

The findings found herein are deemed the Court's Findings of Fact, and the law herein stated shall be deemed the Conclusions of Law.

4. League of Women Voters of Nevada, Legislative Newsletter, December 1, 1965.