*In re* APPORTIONMENT OF STATE LEGISLATURE—1972

OPINION OF THE COURT ·

1. STATES—APPORTIONMENT OF LEGISLATURE—CONSTITUTIONAL LAW—
   COMMISSION ON LEGISLATIVE APPORTIONMENT—SUPREME COURT.

   Michigan Supreme Court, being convinced that it would be
   futile to remand a legislative reapportionment cause to the
   Commission on Legislative Apportionment and having no
   reasonable alternative, must carry out the constitutional man-
   date placed upon it by the people of this state to determine
   "which plan complies most accurately with the constitutional
   requirements" and direct that it be adopted by the Commission
   and published as provided in a section of an article of the
   Constitution (Const 1963, art 4, § 6).

2. CONSTITUTIONAL LAW—WORDS AND PHRASES—PROPOSED—STATES
   —APPORTIONMENT OF LEGISLATURE.

   The word "proposed", in the phrase "proposed plan" in a sec-
   tion of the Michigan Constitution providing for legislative
   reapportionment, is a limitation *not* upon the source of the
   reapportionment plan; *i.e.*, originating from the Commission
   on Legislative Apportionment but rather a limitation upon
   the sponsor of a plan, *i.e.*, the plan must come from one or
   several of the Commissioners (Const 1963, art 4, § 6).

3. STATES—APPORTIONMENT OF LEGISLATURE—COMMISSION ON LEGIS-
   LATIVE APPORTIONMENT—SUPREME COURT—CONSTITUTIONAL ·LAW.

   It was not necessary to submit to the Michigan Supreme Court

REFERENCES FOR POINTS IN HEADNOTES

[1–7, 9–13, 17, 20, 22, 24–26, 29] 25 Am Jur 2d, Elections § 13 *et seq.*
[8] 25 Am Jur 2d, Elections §§ 44, 45.
[14] 25 Am Jur 2d, Elections § 35 *et seq.*
[15, 16] 25 Am Jur 2d, Elections § 37.
[18] 30 Am Jur 2d, Evidence § 1091.
[19] 26 Am Jur 2d, Elections § 211.
[21] 25 Am Jur 2d, Elections §§ 2, 5.
[23] 25 Am Jur 2d, Elections § 53.
[27] 25 Am Jur 2d, Elections § 5.
[28] 25 Am Jur 2d, Elections § 117.

only plans for legislative reapportionment previously presented to the Commission on Legislative Apportionment (Const 1963, art 4, § 6).

4. CONSTITUTIONAL LAW—EQUAL PROTECTION—STATES—APPORTION-MENT OF LEGISLATURE—EQUALITY OF POPULATION.

The controlling criterion for judgment in legislative apportionment controversies, involving bicameral state legislatures, under the equal protection clauses of the Federal and state Constitutions is equality of population as nearly as practicable; a state must make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable.

5. STATES—APPORTIONMENT OF LEGISLATURE—EQUALITY OF POPULATION.

Mathematical exactitude re equality of population is the primary and controlling standard in reapportionment; as between competing plans with identical "equality of population" factors, attention may then be focused upon other considerations such as compactness, shape, etc.

6. STATES—APPORTIONMENT OF LEGISLATURE—EQUALITY OF POPULATION—CONSTITUTIONAL LAW.

Plan filed with the Michigan Supreme Court whereby difference of population between largest and smallest senatorial district is 21, and representative district is 25, purports to be a plan for districting and apportioning of both houses of the Michigan legislature based upon districts containing population as nearly equal as practicable and by such plan districts in both the Senate and House of Representatives are composed of territory containing population as equal as the 1970 Federal Decennial Census permits, the districts by such plan are formed as compact, contiguous, and regular in shape, and do follow county, city, and township boundaries as nearly as practicable, and most nearly complies with the constitutional requirement regarding apportionment of the legislature (Const 1963, art 4, §§ 1-6).

7. STATES—APPORTIONMENT OF LEGISLATURE—COMMISSION ON LEGISLATIVE APPORTIONMENT—ELECTIONS—CONSTITUTIONAL LAW.

The Commission on Legislative Apportionment should be directed to adopt and publish forthwith, as provided by the Michigan Constitution, the reapportionment plan whereby difference of population between the largest and smallest senatorial district is 21, and representative district is 25, which plan shall be

placed in effect for the primary and general elections of 1972 irrespective of whether or not the said plan shall be challenged upon the application of an elector (Const 1963, art 4, § 6).

DISSENTING OPINION

T. E. BRENNAN, J.

8. STATES—APPORTIONMENT OF LEGISLATURE—CONSTITUTIONAL LAW —COMMISSION ON LEGISLATIVE APPORTIONMENT—SUPREME COURT.

The Michigan Constitution creates a Commission on Legislative Apportionment and provides that if the Commission is unable to agree upon a plan of apportionment its members may submit proposed plans to the Michigan Supreme Court, which shall determine which plan complies most accurately with the constitutional requirements and shall direct that it be adopted by the Commission and published as provided in a section of the constitution (Const 1963, art 4, § 6).

9. STATES—APPORTIONMENT OF LEGISLATURE—COMMISSION ON LEGISLATIVE APPORTIONMENT—SUPREME COURT.

Matter of apportionment of state legislature should be remanded to the Commission on Legislative Apportionment, with instructions to submit sealed proposal for apportionment of the legislature within ten days, the same to be opened by the Clerk of the Michigan Supreme Court on a day certain, and with Court in session, the winners to be announced forthwith, based upon the lowest population variance in each House, and with ties broken by reference to the number of political units left intact.

DISSENTING OPINION

BLACK, J.

10. ELECTIONS—NOMINATING PETITIONS—APPORTIONMENT OF LEGISLATURE—CONSTITUTIONAL LAW—STATUTES.

Circulation of nominating petitions under a new legislative apportionment plan could not validly commence, under a section of the Michigan Constitution and present statute, until after July 4, 1972, and that is far too late for the 1972 legislative election (Const 1963, art 4, § 6).

11. STATES—APPORTIONMENT OF LEGISLATURE—ELECTIONS—CONSTITUTIONAL LAW.

Michigan's Constitution as well as the Fourteenth Amendment requires that Michigan's bicameral legislature be newly ap-

*portioned, newly districted and newly elected at the same time, according to a "final plan" based on the 1970 census and readied for the simultaneous election of the Senate and the House in 1974 (US Const, Am XIV).*

12. CONSTITUTIONAL LAW—STATES—APPORTIONMENT OF LEGISLATURE.

*Michigan Supreme Court decision of May 4, 1972 regarding apportionment of the legislature rendered wholly impotent a paragraph of a section of the Michigan Constitution providing: "Upon the application of any elector filed not later than 60 days after final publication of the plan, the supreme court, in the exercise of original jurisdiction, shall direct the secretary of state or the commission to perform their duties, may review any final plan adopted by the commission, and shall remand such plan to the commission for further action if it fails to comply with the requirements of this constitution" (Const 1963, art 4, § 6).*

13. STATES—APPORTIONMENT OF LEGISLATURE—COMMISSION ON LEGISLATIVE APPORTIONMENT—SUPREME COURT.

*The people of Michigan have a right to have the section of their Constitution on legislative apportionment administered faithfully; not twisted and tortured or hurried or delayed for partisan advantage, or shamelessly emasculated by arrant omission of a supposedly responsible Michigan Supreme Court to force Michigan's Commission on Legislative Apportionment to perform its exclusively assigned task of proceeding, within an unexpired 180 day period, to district and apportion the Senate and House of Representatives according to the provisions of the Constitution (Const 1963, art 4, § 6).*

14. STATES—APPORTIONMENT OF LEGISLATURE—COMMISSION ON LEGISLATIVE APPORTIONMENT—SUPREME COURT—CONSTITUTIONAL LAW.

*Michigan has an excellent system of* constitutional *procedure leading to constitutional reapportionment and redistricting of her legislature every ten years; our weak link is the constitutionally appointed supervisor of the Commission on Legislative Apportionment, a partisan nominated and "nonpartisan" elected Supreme Court which simply hasn't the innards to order,* contrary to the will of whatever political party has nominated a majority of the seated Justices, *that the constitutional Commission perform its chore of reapportionment and redistricting of the legislature; a chore which the Michigan Supreme Court may not lawfully take over, a chore that means so much for years ahead to the people of Michigan (Const 1963, art 4, § 6).*

15. CONSTITUTIONAL LAW—APPORTIONMENT OF LEGISLATURE—SU-
PREME COURT—COMMISSION ON LEGISLATIVE APPORTIONMENT.

> *Petition submitting an apportionment plan for the Michigan
> Legislature by the Democratic half of the Commission on Leg-
> islative Apportionment, filed with the Michigan Supreme
> Court on February 1, 1972, and that Court's majority order
> of February 9, 1972 promulgating procedures for proceedings
> to be had under a section of the Michigan Constitution for
> legislative apportionment were and are unconstitutional and,
> except for partisan advantage, they were and yet are so un-
> necessary because the Commission on January 28, 1972, when
> upon allegation of the Democratic Secretary of State the
> Commission planned no further meetings, it actually had more
> than four months within which to complete its work (Const
> 1963, art 4, § 6).*

16. CONSTITUTIONAL LAW—APPORTIONMENT OF LEGISLATURE—ELEC-
TIONS—SENATE—HOUSE OF REPRESENTATIVES.

> *The ultimate "final plan" called for by a section of the Michigan
> Constitution on legislative apportionment is a coordinate that
> should of constitutional intent be applied to simultaneous
> election of the House and Senate and that cannot be done,
> validly, until proceedings upon the application of any elector
> under that section of the constitution have been concluded
> in time for the concurrent elections of 1974 for the House
> and Senate (Const 1963, art 4, § 6).*

17. CONSTITUTIONAL LAW—EQUAL PROTECTION—BICAMERAL LEGISLA-
TURE—APPORTIONMENT OF LEGISLATURE—POPULATION BASIS.

> *As a basic constitutional standard, the Equal Protection Clause
> requires that the seats of both houses of a bicameral state leg-
> islature must be apportioned on a population basis.*

18. EVIDENCE—CIRCUMSTANTIAL EVIDENCE—PROOFS—WITNESSES.

> *Circumstances, which are things, constitute inflexible proofs;
> witnesses may be mistaken or careless in their use of words,
> especially when interested in the judicial result; circumstances
> can be neither; they cannot lie, once they are established.*

19. JUDGES—DISQUALIFICATION—SUPREME COURT—COURT OF APPEALS
—APPORTIONMENT OF LEGISLATURE—CONSTITUTIONAL LAW.

> *The partisan-nominated Michigan Supreme Court should dis-
> qualify itself from a case on legislative apportionment in
> favor of plenary resubmission under a section of the Michigan
> Constitution and before the nonpartisan nominated and non-
> partisan elected Court of Appeals, with that Court sitting*

en banc *by authority of an order entered pursuant to a section of the judicial article of the Michigan Constitution (Const 1963, art 4, § 6; art 6, § 23).*

20. STATES—APPORTIONMENT OF LEGISLATURE—COMMISSION ON LEGISLATIVE APPORTIONMENT—SECRETARY OF STATE—CONSTITUTIONAL LAW.

*Nothing in the Michigan Constitution and nothing whatever in the "rules of procedure" which the Commission on Legislative Apportionment adopted authorized the Secretary of State to write a letter for support of an allegedly commenced judicial proceeding on legislative apportionment; nothing in a section of the article in the Michigan Constitution providing for legislative apportionment or the Commission's rules authorizes the institution of a judicial proceeding on apportionment in the absence of a "cannot agree" resolution of the Commission itself (Const 1963, art 4, § 6).*

21. CONSTITUTIONAL LAW—CONSTRUCTION—COMMON UNDERSTANDING —INTENT.

*The primary rule of construction of a constitution is the rule of "common understanding" and the interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it; as the intent to be arrived at is that of the people who ratified it.*

22. STATES—APPORTIONMENT OF LEGISLATURE—COMMISSION ON LEGISLATIVE APPORTIONMENT—SUPREME COURT—CONSTITUTIONAL LAW.

*The word "proposed" in the phrase "proposed plan" was put in the article of the Michigan Constitution for submission of proposed plans to the Michigan Supreme Court if a majority of the Commission on Legislative Apportionment cannot agree on a plan for apportionment of the legislature, for the precise purpose of restricting submission to the Court of a plan or plans theretofore proposed to the Commission and turned down there, subject only to the inherent power of the Supreme Court to act decretally should there be some emergency or other equitably justifying reason for delayed filing of a plan not previously proposed to the Commission (Const 1963, art 4, § 6).*

23. CONSTITUTIONAL LAW—DUE PROCESS—FAIR TRIAL—FAIR TRIBUNAL—STATES—APPORTIONMENT OF LEGISLATURE.

*A fair trial in a fair tribunal is a basic requirement of due process; but has been denied patently by the Michigan Su-*

preme Court's judgment of May 4, 1972 on a legislative apportionment case.

24. STATES—APPORTIONMENT OF LEGISLATURE—COMMISSION ON LEGISLATIVE APPORTIONMENT—SUPREME COURT—CONSTITUTIONAL LAW.

Order should be entered advising the constitutional commissioners on legislative apportionment that they should receive and consider all plans for legislative apportionment they wish the Michigan Supreme Court to examine according to the test in an article of the Michigan Constitution for that Court to determine which plan complies most accurately with the constitutional requirements; further, if unable to agree then, that they should meet for the making of a due and final record of constitutional disagreement; that record with all plans the Commission has considered and failed to adopt should then be submitted to the Supreme Court as constitutionally directed for proceedings under that article of the Constitution (Const 1963, art 4, § 6).

25. STATES—APPORTIONMENT OF LEGISLATURE—COMMISSION ON LEGISLATIVE APPORTIONMENT—COURT OF APPEALS—SUPREME COURT—CONSTITUTIONAL LAW.

Order should be entered directing that the Court of Appeals be assigned en banc to Supreme Court duty under the judicial article of the Michigan Constitution, the specific assignment to be that of hearing and determining all proceedings rightfully instituted under a section of an article of that Constitution for legislative apportionment and arising out of the decennial census of 1970 (Const 1963, art 4, § 6; art 6, § 23).

DISSENTING OPINION

T. G. KAVANAGH, J.

26. CONSTITUTIONAL LAW — APPORTIONMENT OF LEGISLATURE — SUPREME COURT.

Michigan Supreme Court has no proper function at all in apportionment of the Michigan Legislature because the provisions of the Michigan Constitution which would place that responsibility on the Court are invalid as in contravention of the United States Constitution (Const 1963, art 4).

27. CONSTITUTIONAL LAW—COMMISSION ON LEGISLATIVE APPORTIONMENT—APPORTIONMENT OF LEGISLATURE—NONPOPULATION FACTORS.

A section of an article of the Michigan Constitution which established the Commission on Legislative Apportionment had to be held void when the United States Supreme Court struck

*down nonpopulation factors in apportionment because that section was so dependent upon the continuing validity of the preceding sections of that article of the Constitution by which the Commission's duties were specified and expressly limited, that it could not survive alone (Const 1963, art 4, § 6).*

28. CONSTITUTIONAL LAW—COMMISSION ON LEGISLATIVE APPORTIONMENT—POLITICAL PARTIES—DISCRIMINATION.

*The provision in the Michigan Constitution requiring a third political party to receive more than 25% of the Gubernatorial vote in order to obtain representation on the Commission on Legislative Apportionment and making no provision for representation for other political parties receiving less than 25% but still representing a significant number of voters, is invidious discrimination offensive to both the First and Fourteenth Amendments because if a class be recognized there may be no legal discrimination in favor of part of that class (US Const, Ams I, XIV; Const 1963, art 4, § 6).*

29. CONSTITUTIONAL LAW—COMMISSION ON LEGISLATIVE APPORTIONMENT.

*There is no valid Commission on Legislative Apportionment under an article of the Michigan Constitution and hence there is no need to review their work; indeed it is wholly improper (Const 1963, art 4).*

Four original petitions by various members of the Commission on Legislative Apportionment, filed under the provision of the Constitution of 1963, submitting proposed apportionment plans for the state legislature, one petition and plan by Edwin P. Hughes, one petition and plan by Paul G. Goebel, Sr., Ralph E. Huhtala, Anthony C. Licata, and Kenneth E. Thompson, one petition and plan by Virginia Selin, and one petition and plan by Lillian Hatcher and A. Robert Kleiner. Submitted March 6, 1972. (No. 13 March Term 1972, Docket No. 53,919.) Decided May 4, 1972. Commission ordered to adopt the Hatcher-Kleiner plan, publish it forthwith, and put it into effect for the 1972 election. Dissenting opinion by BLACK, J., filed May 8, 1972, and dissenting opinion by T. G. KAVANAGH, J., filed May 10, 1972.

Application filed by petitioners-electors, pursuant to
Const 1963, art 4, § 6, ¶ 8, and motion for immediate
consideration denied September 11, 1972. BLACK, J.,
not participating. T. E. BRENNAN and T. G. KAV-
ANAGH, JJ., dissenting.

*Foster, Lindemer, Swift & Collins (Peter F. Mc-
Nenly,* of counsel), for Commissioners Goebel,
Huhtala, Licata and Thompson.

Virginia Selin, *in propria persona.*

Edwin P. Hughes, *in propria persona.*

Lillian Hatcher and *A. Robert Kleiner, in propriis
personis.*

T. M. KAVANAGH, C. J. The people, in adopting the
1963 State Constitution, provided the procedure to
carry out legislative reapportionment.[1]  However,
for the second time in eight years the Court has had
thrust upon it a proceeding which historically has
been a legislative rather than a judicial one.

The activities of the political parties during the
1964 Commission on Legislative Apportionment, and
the political shenanigans of both political parties
making up the Commission this year, as brought out
in oral argument before this Court, convinced a
majority of the Court that it would be futile to re-
mand this cause to the Commission for further pro-
ceedings.

We, having no reasonable alternative, must carry
out the constitutional mandate placed upon us by
the people of this state, and that is to determine
"which plan complies most accurately with the con-
stitutional requirements" and direct that it be
adopted by the Commission and published as pro-
vided in Const 1963, art 4, § 6, paragraph 7.  In

---

[1] Const 1963, art 4, § 6.

short, it is constitutionally incumbent upon our Court to evaluate, approve and mandate.

There is, however, one procedural problem which is present in the Republican's "Motion to Foreclose" which, as a threshold issue, must be resolved, *viz.*, whether § 6, paragraph 7 requires expressly or impliedly that a "proposed plan" must have been submitted to the Commission as a condition precedent to submission of the proposed plan to our Court.

It is submitted, and we agree, that the word "proposed" is a limitation *not* upon the source of the plan, *i.e.*, originating from the Commission but rather a limitation upon the sponsor of a plan, *i.e.*, the plan must come from one or several of the Commissioners. The Constitutional Convention debates support this construction.[2] Conversely viewed, the drafters never intended to freeze the plans as submitted to the Commission but, rather, to allow compromise and collaboration between the members of the Commission in coming up with a plan after a member's or party's pet plan has failed to secure a majority but before submission of the compromise "proposed plan" was submitted to our Court. In short, once the Commission failed to agree, a Commissioner—but only a Commissioner—could propose his plan to our Court.

The balance of the arguments, pro and con, upon the motion to foreclose consideration have little merit. As to the "applicable principles of law," the Republicans candidly concede that "the above cases are not

---

[2] The "liberalizing" intent of permitting *any* Commissioner to propose his plan to the Supreme Court and not be bound by the "party" plan which was submitted to the Commission is reflected by Delegate Pollock's comments and amendment which was eventually adopted by the Convention by vote of 70 to 30 (2 Official Record, Constitutional Convention 1961, pp 2023–2025). For the other side of the coin, *i.e.*, freezing the "party" plan which would be submitted to our Court, see *e.g.*, the comments of Delegate Danhof (2 Official Record, Constitutional Convention 1961, p 2024).

dispositive of the present controversy. They all arose in factual situations radically different from the present case." As to the "public policy consideration," neither party is coming into our Court with clean hands. Both have engaged in partisan maneuvering. Both sides frankly admit they did not pass upon all of the plans submitted to the Commission. This is borne out by the Commission's minutes, which reflect that 19 last hour motions for adoption of plans by the members failed for want of a concurrence of a majority. We hold it was not necessary to submit to our Court only plans previously presented to the Commission. Finding it unnecessary, we do not rule on the question of whether the various plans were in some form or other before the Commission.

In March, 1971, the State Central Committees of the Democratic and Republican parties respectively appointed four members to the Commission on Legislative Apportionment pursuant to Const 1963, art 4, § 6. Upon the advice of Attorney General Kelley,[3] Secretary of State Richard Austin, acting as the constitutionally designated Secretary of the Commission, convened the Commission on April 23, 1971. Chairman and co-chairman of the Commission were elected and rules of procedure were adopted. On September 17, 1971, the Commission unanimously established midnight of January 28, 1972, as a tentative deadline for completing its work.

Statewide public hearings on reapportionment plans and proposals were conducted. During the 16 formal meetings of the Commission, including the

---

[3] Letter opinion of Attorney General, dated March 2, 1971, summarizes (p 5):

"In summary, it is my opinion that the secretary of state must issue a call not less than 30 nor more than 45 days after February 10, 1971 but that the apportionment commission will have 180 days after the Bureau of the Census furnishes the state with block and tract data which it will require to complete its work."

final meeting held on January 28, 1972, some 23
complete or partial Senate plans and 20 complete or
partial House plans were submitted by the members
of the Commission. The Commission, despite 19
"last hour" motions for adoption by its members,
failed to agree on a plan for want of a "concurrence
of a majority of the members." Also at the January
28, 1972 meeting, four separate motions were made
to extend the deadline set by the September 17, 1971
resolution. All motions failed for want of a major-
ity. Chairman Goebel adjourned the meeting, with-
out future date, at 12:05 a.m. on January 29, 1972.

Order of the Court (BLACK, J., dissenting) entered
February 9, 1972, promulgating procedures for pro-
ceeding under art 4, § 6, paragraph 7, which in es-
sence advised submission of any other proposed
plans on or before February 18, 1972, the filing of
written objections to any such plan on or before
February 25, 1972, and offered opportunity for oral
presentation or objections, upon written demand
therefor filed on or before the latter date, before the
specially convened bench on March 6, 1972. Subse-
quently, four apportionment plans were submitted.

The controlling criterion for judgment in legisla-
tive apportionment controversies, involving bicam-
eral state legislatures, under the equal protection
clauses of the Federal and state Constitutions is
equality of population as nearly as practicable. As
more fully stated by this Court in 373 Mich 250, 251,
adopting the holding of *Reynolds* v *Sims,* 377 US
533; 84 S Ct 1362; 12 L Ed 2d 506 (1964):

" 'We hold that, as a basic constitutional standard,
the equal protection clause requires that the seats in
both houses of a bicameral State legislature must
be apportioned on a population basis. * * *

" 'By holding that as a Federal constitutional req-
uisite both houses of a State legislature must be ap-

portioned on a population basis, we mean that the equal protection clause requires that a State make *an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable.'*"		(Emphasis added.)

Although the Court in *Reynolds* states that "mathematical nicety is not a constitutional requisite" (pp 569, 577) and suggests other relevant but subordinate state considerations (pp 576–577), subsequent decisions of the United States Supreme Court have largely clarified and confirmed or dispelled and disclaimed this dicta.		Thus, in *Swann* v *Adams,* 385 US 440, 444; 87 S Ct 569, 572; 17 L Ed 2d 501 (1967), the Court rejected the argument that *de minimis* population variances were tolerable, without any justification or explanation, under the "as nearly as practicable standard," and consonantly concluded:

"On the contrary, the *Reynolds* opinion limited the allowable deviations to those minor variations which 'are based on legitimate considerations incident to the effectuation of a rational state policy.' 377 US 533, 579.		Thus that opinion went on to indicate that variations from a pure population standard might be justified by such state policy considerations as the integrity of political subdivisions, the maintenance of compactness and contiguity in legislative districts or the recognition of natural or historical boundary lines."

The "equality of population" criterion received an even more stringent construction in *Kirkpatrick* v *Preisler,* 394 US 526; 89 S Ct 1225; 22 L Ed 2d 519 (1969), where the Court found that population disparities could not be justified on the ground that the state was attempting to avoid fragmenting political subdivisions or, conversely viewed, at-

tempting to inhibit partisan gerrymandering.[4]   The
Court held in *Kirkpatrick* v *Preisler, supra,* pp 533–
534:

"Similarly, we do not find legally acceptable the
argument that variances are justified if they neces-
sarily result from a State's attempt to avoid frag-
menting political subdivisions by drawing congres-
sional district lines along existing county, municipal,
or other political subdivision boundaries.   The
State's interest in constructing congressional dis-
tricts in this manner, it is suggested, is to minimize
the opportunities for partisan gerrymandering.   But
an argument that deviations from equality are justi-
fied in order to inhibit legislators from engaging in
partisan gerrymandering is no more than a variant
of the argument, already rejected, that considera-
tions of practical politics can justify population dis-
parities."

It is true that *Kirkpatrick* is distinguishable in that
it involved a *congressional* districting statute.   How-
ever, a close reading of the January 24, 1972 *per
curiam* opinion in *Connor* v *Williams,* 404 US 549;
92 S Ct 656; 30 L Ed 2d 704 (1972), discloses that
population disparities brought on by state legislative

[4] It should be noted that in the companion case of *Wells* v
*Rockefeller,* 394 US 542, 544; 89 S Ct 1234; 22 L Ed 2d 535 (1969),
the Court expressly declined ruling on the constitutionality of par-
tisan gerrymandering.   For some expressions by the Justices on
our Court see 376 Mich at pp 426–427 (KELLY, J.); p 457
(ADAMS, J.); pp 477–479 (SMITH, J.).   It is suggested that, even
if the anti-gerrymandering devices of compactness, shape, adherence
to existing boundary lines, etc., have some continuing viability,
such state standards, at best, serve as a minimal factor in the judicial
determination as to the constitutionality of a proposed reapportion-
ment plan.   Thus, the judicial selective process should ascertain
which of the submitted plans contains the least population disparity.
If competing plans are equal in this factor, then, but only then,
should judicial attention focus upon the anti-gerrymandering factors.
This opinion, of course, presents all of the factors utilized by the
members of the Commission rather than only those which we consider
to be relevant.   As a matter of history, however, see the arguments
of petitioners, summarized by Justice SMITH in 376 Mich 410, 473,
in the context of current constitutional law.

apportionment along boundary lines raise a substantial constitutional question and that the United States Supreme Court only deferred ruling on the applicability of *Preisler* and *Wells* until they have an appropriate appellate vehicle. Prudence would counsel avoidance of the problems presented in *Preisler* and *Wells, viz.,* attempting to justify population disparities on the basis of anti-gerrymandering techniques.[5] In end analysis, mathematical exactitude re equality of population is the primary and controlling standard. As between competing plans with identical "equality of population" factors, attention may then be focused upon other considerations such as compactness, shape, etc.[6]

Analysis of the Senate and House plans proposed by the respective members of the Apportionment Commission discloses the following data on p 457.

This Court after examining each of the plans finds as a fact that all plans to some degree, and of manifest necessity, cross or recross county, city or township lines.

The Court findings that the so-called Hatcher-Kleiner plan filed in our Court on February 18, 1972, purports to be a plan for districting and apportion-

[5] For limited endorsement of the same caveat by at least some of the Democratic members and all of the Republican members, see Hatcher-Kleiner brief 16–17, Selin brief 17, GHLT brief 9–10.

On the other hand, these same members endorse and urge the continuing validity of subordinate but legitimate objectives such as compactness, shape, contiguity, etc. It is argued that this was the consensus opinion of our Court in 377 Mich 396 (*i.e.,* excluding the views of Justice SOURIS and "perhaps" those of Justice SMITH). See, *e.g.,* Selin brief 11. The relative merit accorded each of these subordinate but legitimate objectives is concisely stated in GHLT brief 17.

[6] Although not explicitly stated in terms of gradient standards as above, I believe that our Court, as indicated in 373 Mich 250, 253–254, utilized this reasoning process. For a concise but thorough analysis of the constitutional principles and mathematical tests applicable to the apportionment question see *Dungan* v *Sawyer,* 253 F Supp 352 (D Nev, 1966).

SENATE (Ideal District 233,753)

| Numerical Disparity Largest to Smallest | Population Variance Ratio | Average Deviation from Ideal Size | % Capable of Electing Majority (optimun 52,6316) | Political Units Split | |
|---|---|---|---|---|---|
| **Hatcher-Kleiner** | | | | | |
| 21 (Dist 17=233,762) (Dist 23=233,741) | 1.0001:1 | 2.66 or .0011% | 52.6310% | 59 | 33 Counties 15 Cities 11 Townships |
| **GHLT** | | | | | |
| 92 (Dist 22=233,789) (Dist 31,233,697) | 1.0003:1 [1.00039:1] | 18.71 or .0080% | 52.628% | 32 | 18 Counties 10 Cities 4 Townships |
| **Selin** | | | | | |
| 194 (Dist 34=233,844) (Dist 19=233,650) | 1.0008:1 | 43.08 or .0184% | 52.6228% | 40 | 25 Counties 10 Cities 5 Townships |
| **Hughes** | | | | | |
| 1799 (Dist 11=234,709 (Dist 14=232,910) | [1.0077:1] | [444.08 or .1900%] | [52.5368%] | 30 | 18 Counties 11 Cities 1 Township |

Total Population 1970 Census = 8,882,619

HOUSE (Ideal District 80,751)

| Population Disparity Largest to Smallest | Population Variance Ratio | Average Deviation from Ideal Size | % Capable of Electing Majority (optimun 52.6316) | Political Units Split | |
|---|---|---|---|---|---|
| **Hatcher-Kleiner** | | | | | |
| 25 (Dist 77=80,765) (Dist 107=60,740) | 1.0003:1 | 3.1 or .0038% | 50.9072% | 118 | 49 Counties 33 Cities 36 Townships |
| **GHLT** | | | | | |
| 79 (Dist 79=80,799) (Dist 11=80,720) | 1.0009:1 [1.00098:1] | 14.41 or .0178% | 50.901% [50.9002%] | 73 | 28 Counties 27 Cities 18 Townships |
| **Selin** | | | | | |
| 124 (Dist 107=80,833) (Dist 32 & 82= 80,709) | 1.00015:1 | 24.74 or .0306% | 50.8939% | 96 | 43 Counties 31 Cities 22 Townships |
| **Hughes** | | | | | |
| 991 (Dist 89=81,313) (Dist 49=80,322) | [1.01234:1] | [94.45 or .1170%] | [50.8505%] | 78 | 36 Counties 28 Cities 14 Townships |

Total Population 1970 Census = 8,882,619

ing of both houses of the Michigan Legislature based
upon districts containing population as nearly equal
as practicable. By such plan, districts for both the
Senate and House of Representatives are composed
of territory containing population as equal as the
1970 Federal Decennial Census permits. Subject to
this controlling objective of substantially equal pop-
ulation, and to the extent it would not be subordi-
nated, districts established by such plan are formed
as compact, contiguous, and regular in shape, and
follow county, city and township boundaries, as
nearly as practicable.

While it is not possible to develop detailed con-
stitutional requirements, there can be no question
of the overriding requirement of "districts, in both
houses of its legislature, as nearly of equal popula-
tion as is practicable." The Hatcher-Kleiner dis-
tricting and apportionment plan, filed in this Court
on February 18, 1972, most nearly complies with said
constitutional requirement.

Therefore, it is ordered that the Commission on
Legislative Apportionment be, and it hereby is, di-
rected to adopt and publish forthwith, as provided
in § 6 of article 4 of the Michigan Constitution of
1963, the aforesaid Hatcher-Kleiner plan, which plan
shall be placed in effect for the primary and general
elections of 1972, irrespective of whether or not the
said plan shall be challenged upon the application of
an elector pursuant to the final paragraph of said
§ 6 of article 4.

Nominating petitions may be filed or the statutory
filing fees paid for the office of State Representative
at any time after the date of this order up to and
including 4 p.m., Eastern Standard Time, on June
20, 1972. See MCLA 168.163; MSA 6.1163, and 1
OAG, 1955, No 2,403, p 784 (December 30, 1955).

Considering the limited time which remains for the giving of notices of the 1972 legislative elections, no motion or application for a stay of this order will be entertained by this Court. Any person deeming himself aggrieved by this order may, for the purposes and requisites of USSC Rules 18, 50, and 51 proceed to move or apply forthwith for a stay pursuant to said rules, in the same manner as if he had previously and vainly moved or applied to this Court for such stay.

ADAMS, SWAINSON, and WILLIAMS, JJ., concurred with T. M. KAVANAGH, C. J.

T. E. BRENNAN, J. (*dissenting*). The constitution creates a Commission on Legislative Apportionment. Four members are Republicans, four members are Democrats. Every ten years the Commission meets. Every ten years the Commission is unable to agree.

The constitution provides that if the Commission is unable to agree upon a plan of apportionment, its members may submit proposed plans to the Supreme Court.

The constitution then says,

"The supreme court shall determine which plan complies most accurately with the constitutional requirements and shall direct that it be adopted by the commission and published as provided in this section." Const 1963, art 4, § 6.

Citing Federal uses, the majority concludes,

"In end analysis, mathematical exactitude re equality of population is the primary and controlling standard. As between competing plans with identical 'equality of population' factors, attention may then be focused upon other considerations such as compactness, shape, etc."

Using this yardstick, the majority chooses a senate plan which subdivides 59 local units of government over a plan which splits 32 political subdivisions, because the former has a variance of only 21 residents while the latter has a variance of 92 persons from the largest to the smallest senate district.

In the House, they choose a plan which splits 118 political units and varies by 25 residents over a plan which splits 73 units and varies in population by 79 persons.

Our position is not enviable. The constitution seems to contemplate that we apply some new-born standard of relative constitutionality.

I never heard of one law being "more constitutional" than another. Constitutionality is like pregnancy. Either you is or you ain't.

Nevertheless, we are enjoined to decide which plan "complies most accurately". In doing so, the majority have chosen the simple expedient of comparing the numerical population differences.

Of course, the standard is purely arbitrary and artificial. Population ratios of 1.001 to 1, 1.003 to 1 or 1.009 to 1 are all so infinitesimal as to be meaningless. Everyone would readily concede that even by the time the census report was published, the actual population of the districts had already changed by more than a few ten-thousandths of their ratio to other districts, if indeed the census takers were that accurate in the first instance.

Still, arbitrary as strict nose-count may be as a constitutional standard, it does have considerable merit as a means of extricating this Court from its decennial dilemma.

If we were to settle upon actual population variance as the prime standard, with "number of local units of government subdivided" as the secondary, or tie-breaker yardstick, at least the contending cau-

cuses on the apportionment commission would know
the rules of the game, and both would be able to make
their best efforts to win the prize.

Fairness and impartiality, however, require one
further stipulation. If we are going to let the con-
tract to the lowest bidder we ought to insist upon
sealed bids.

It is patently unfair to require one side to make
its final offer, and then permit the other side to sub-
mit a lower bid.

On the day the Commission met for the last time,
the Republicans had submitted the lowest bid.
This Court then reopened the bidding and permitted
the Democrats to come in on the last day with a lower
bid, not previously submitted to the Commission.
The Court then refused to remand the matter to the
Commission to permit further downward revision.

In my opinion, the matter should be remanded to
the Commission, with instructions to submit sealed
proposals within ten days, the same to be opened
by the Clerk of this Court on a day certain, and with
Court in session, the winners to be announced forth-
with, based upon the lowest population variance in
each House, and with ties broken by reference to the
number of political units left intact.


BLACK, J. (*dissenting*).

"The party lash and the fear of ridicule will over-
awe justice and liberty; for it is a singular fact, but
none the less a fact, and well known by the most com-
mon experience, that men will do things under the
terror of the party lash that they would not on any
account or for any consideration do otherwise."[1]

With equal application to that perfectly coincident
dovetail known as the *UAW* case [Michigan State

[1] From Mr. Lincoln's historic "Lost Speech", delivered May 29,
1856, at the First Republican State Convention in Illinois. "Life

*UAW Community Action Program Council v Secretary of State*] (*post* starting p 506), it may be written cynically of this highly irregular, prematurely commenced and rammed through proceeding that never have so few done so much and so fast for any political party. Mighty hosannahs for the Brethren four will be sounded and sung from out Detroit, the darkly portentous tones of which, pealed to the perverted music of "Michigan *our* Michigan", are bound to carry from Saginaw's tall whispering pines to Lake Superior's farthest mines.

### *First: Preliminary Outline and Comment*

In the Great Journal of things that are due to happen in the course of Michigan's judicial annals, this in the ultimate is bound to be the most gravely consequential of *all* proceedings that will have come to the highest Court of our state during the present decade. On that account the proceeding has deserved much more than the peremptory attention it has received since first filing here on February 1. And since the raw power of 4 votes has from the beginning tolerated no thought that § 6 of the legislative article should be administered *deliberately* through *all* procedural requirements of that section, with judicial aim timed to the *concurrent* Senate and House elections of *1974,* the ensuing dissent must be equally harsh. All cavil aside, today's prodded decision is tainted with every indicia of partisanship; the prospect of which is Democratic advantage effected by holding *this year's* election of the House of Representatives *according to a new Democratic rearrangement of the House elective districts.* As such the decision will steer to great extent the political destiny of our state until 1982. That is enough to stimulate roughcast dissent.

and Works of Abraham Lincoln", Vol 2 "Early Speeches", pp 279, 280. (Centenary Edition, published 1907 by the Current Literature Publishing Co., New York).

This is the constitutional fourth year when we elect the President. It is *the* elective year of that ever greater turnout of Democratic voters. It is *the* elective year for which this Court — accomplished by another summary partisan order dated March 10; *UAW* v *Austin,* post [*Michigan State UAW Community Action Program Council* v *Secretary of State*] — has just reregistered thousands of former registered voters on demand of the Democratic party. It is one of *the* elective years, unlike 1964, 1966 and 1974, when but *one* division of our bicameral Legislature may by the Constitution be nominated and elected. It is *the* elective year when nominating petitions for the office of State Representative may be circulated *lawfully* up to this year's June 20 deadline only within the *1966-established House elective districts.* In any view of this proceeding, the just approved Democratic plan cannot "become law" ahead of time without breaking the law.

Finally, this is *the* year for which there lays fully unfolded a hurriedly-hatched and purposely mistimed scheme of the Democratic party to take over, decisively, the House of Representatives. From its onset January 28 that scheme has depended upon recklessly fast judicial action, decreed not of legal right or authority but of partisan insistence. Now, on May 4, the Court has forced headlong upon the electorate and all House candidates a frankly partisan rearrangement of the elective districts of the House to accommodate an illegal time-schedule. Even if the constitutionally required 60-day publication were to commence *tomorrow,* rather than a few days hence, circulation of nominating petitions under the new plan could not validly commence, under § 6 and present statute, until after July 4. That is far too late by the law we are sworn to up-

hold and enforce, as the acting Chief Justice urgently adjured by his memo of February 3 (Appendix III, *post* p 487). Yet a Court that accuses others of "political shenanigans" has just ordered that such be done. Quite a Court, this!

As we shall see by official documents, time for what has been granted here became the great essence of partisan necessity and, yes, necessity knows no law. It was of that essence when the Democratic half of the constitutional Commission on Legislative Apportionment abruptly forsook constitutional duty and ran *ex parte* to this Court on February 1. It is even more of that frantic essence, now that the called *legal* deadline of "April 10 or 11" has come and gone. Did not the acting Chief Justice sound the Democratic call to arms by this sentence:

"This means that if a new plan is to be adopted for the 1972 elections, this Court is faced with a deadline on or about April 10 or 11 to decide upon a plan."?[2]

It just doesn't matter that the Senate has already been elected for a four-year term ending December 31, 1974 (under apportionment and districting based on the *1960* census). It doesn't matter that our Constitution as well as the Fourteenth Amendment requires that Michigan's bicameral Legislature be newly-apportioned, newly districted and newly elected at the same time, according to a "final plan" *based on the 1970 census and readied for the simultaneous election of the Senate and the House in 1974.* It doesn't seem to matter that today's precipitous decision will have rendered wholly impotent paragraph 8 of § 6:

"Upon the application of any elector filed not later than 60 days after final publication of the plan, the

─────────────
[2] The sentence appears in acting Chief Justice Adams' memo to the Justices dated February 3. See it in entirety, Appendix III, *post* p 487.

supreme court, in the exercise of original jurisdiction, shall direct the secretary of state or the commission to perform their duties, may review any final plan adopted by the commission, and shall remand such plan to the commission for further action if it fails to comply with the requirements of this constitution."

All that matters is that the Democratic party, which by its appointed representatives at bar is the real and instant movant, wants to dominate pronto the House of Representatives before taking on the Senate in 1974; the Constitution and the rights thereunder of a deserving people to the contrary notwithstanding.

Unwittingly four Democratic nominees to this Court have set the degrading tone of what was instituted as a colorable — because premature — proceeding. They excuse it however, as when the pot called the kettle black, the four having blandly indicted "both political parties making up the Commission this year" with allegation that those thus described have been guilty of "political shenanigans".[3] Meanwhile however, the four have made uncharacteristic haste to provide — months ahead of the prescribed constitutional schedule — exactly what the Democratic half of the Commission demanded when it moved here February 1 and hotwired a partially absent Court into galvanic action. As acting Chief Justice ADAMS unguardedly admitted at the time, there was due to be "considerable pressure for the Court to act as speedily as possible".[4] No overstatement that, as party whip and the

[3] The quotations appear in the second paragraph of the majority opinion, *ante* p 450 and again *post* p 483.

[4] The quotation appears in that urgent memo of February 1 which acting Chief Justice ADAMS circulated within minutes after the presently-considered Hughes plan and petition were filed in our clerk's office. The memo in entirety is annexed as Appendix I, *post* p 485.

ensuing partisan drive to today's political decision
have quickly proved.

Since the recording of that odious partisan-divi-
sive decision "by impasse" (April 6, 1966; *In re
Apportionment of Legislature,* 377 Mich 396, 416,
474, 475), I have remained grimly around to take
part in this second of Michigan's decennially momen-
tous legislative apportionment proceedings.  As in
1966, I stand for the right of our people to have
§ 6, article 4 of their Constitution administered
faithfully; not twisted and tortured or hurried or
delayed for partisan advantage, or shamelessly
emasculated by arrant omission of a supposedly
responsible Court to *force* Michigan's Commission
on Legislative Apportionment to perform its *exclu-
sively* assigned task.  What *exclusive* task — you
ask?  Why simply that of proceeding, *within that
to this day unexpired 180-day period,* "to district
and apportion the senate and house of representa-
tives according to the provisions of this constitu-
tion".

This dissent is written in part to caution other
states that may have contemplated, unto now, the
adoption of decennial apportionment proceedings
like ours.  They should look first to the supposedly
responsible human element that is *finally* involved,
for as Alexander Pope wrote:

"For forms of government let fools contest;
Whate'er is best administer'd is best."

Which is to say precisely that Michigan has an
excellent system of *constitutional* procedure leading
to *constitutional* reapportionment and redistricting
of her Legislature every ten years; also that our
now and since-1966 proven weak link is the con-
titutionally appointed supervisor of the constitu-

tional Commission.[5]   It is a partisan nominated and
"nonpartisan" elected Supreme Court[6] which simply
hasn't the innards to order, *contrary to the will of
whatever political party has nominated a majority
of the seated Justices,* that the constitutional Com-
mission perform from start to paragraph 8 finish
its decennially steamheated chore of reapportion-
ment and redistricting of the Legislature; a chore
which the Court may not lawfully take over, a chore
that means so much for years ahead to the people of
Michigan.

Where other states have available a really non-
partisan Court of final resort to supervise, the sys-
tem should work to general satisfaction; no matter
the consequential sore toes of partisans.   But where
such a Court is not available or callable into service,
I tender with deference this gratuitous advice; don't
try the Michigan system.   Try anything but that.
Witness our ignominy of 1966, starting with the
writer's January 17, 1966, memorandum (377 Mich
408) headed "for issuance of immediate mandatory
writ" and ending with that four-four standoff of a
then equally-divided Supreme Court (377 Mich 474,
475).   And witness now the execrable omission of a
Democratic majority here to tell the Commission it
must start out anew and of right by submitting to
*all* of its members *all* of the various plans its mem-
bers desire voted upon by the Commission so that, if
*all* action of the Commission is negative, the submit-
ted and Commission-considered plans, those only,

---

[5] See outline of Missouri's method, where the final authority is
nonpartisan; 377 Mich 411, 412.

[6] We have in Michigan five classes of courts that make up our
judicial system.   They are the District Courts, the Probate Courts,
the Circuit Courts, the Court of Appeals, and the Supreme Court.
The Supreme Court is our *only* partisan-nominated Court.   And it
is the only *partisan-nominated* and *nonpartisan-elected Supreme Court*
in the United States.

are turned over to the Supreme Court for paragraph 7 test.

The February 1 dash to this Court of the Democratic half of the constitutional Commission, and the Court's helter-skelter majority order of February 9 (see Appendix IV, *post* at p 489), were and are unconstitutional. Except for partisan advantage, they were and yet are so unnecessary. On January 28 last, when upon allegation of the Democratic Secretary of State the Commission planned no further meetings, the Commission had used but 49 days of that 180-day period which, by paragraph 5 of § 6, was and yet is provided for completion of its task. The *Commission on January 28 actually had more than four months within which to "complete its work"*. Further, and commencing with the Court's order of February 9, it simply wasn't possible (lawfully that is), to perform and complete *all* of the requirements of § 6, including those of previously quoted paragraph 8, in time for any legislative election of 1972. Besides, the ultimate "final plan" called for by § 6 is a coordinate that should of constitutional intent be applied to simultaneous election of the House and Senate and that cannot be done, validly, until paragraph 8 proceedings have been concluded in time for the concurrent elections of 1974.[7]

It is plain, then, that the presently seated majority means by its judgment to bless our supposedly bicameral Legislature as a constitutionally-functioning body in 1973 and 1974, even though half of it was elected in 1970 for a four-year term according to

___

[7] Separate provisions of the Constitution provide that the Senate be elected for four-year terms; the House for two-year terms. The *simultaneous* elections of the Senate and House in 1964 and again in 1966, *those years only,* were specially-authorized and directed by § 5 of the constitutional schedule, but that section by its express terms has had no application since 1966.

a 1966 apportionment plan, and even though by the Court's instant order the other half is to be elected *this year* according to a new plan of apportionment (a Democratic plan of course).

If Lincoln were here he surely would brand this political trick as half bastard and half legitimate. Doubtless, too, he would point out that all upcoming 1973 and 1974 legislation would stand constitutionally suspect for want of compliance with that which is now basic:

"We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats of *both* houses of a bicameral state legislature must be apportioned on a population basis." (*Reynolds* v *Sims,* 377 US 533, 568; 84 S Ct 1362; 12 L Ed 2d 506 [1964].)

Section 6 contemplates flatly that *both* elections take place at the same time according to a "final plan". Can there be a "final plan", made ready willy-nilly for two-year-separated elections of the two houses of the legislature, especially when that plan has never been tested under paragraph 8 of the section? For answer it is time to set forth here, verbatim, *entire* § 6 (each paragraph, unnumbered by the Constitution, is bracketed for ready convenience):

[1]
"Sec. 6. A commission on legislative apportionment is hereby established consisting of eight electors, four of whom shall be selected by the state organizations of each of the two political parties whose candidates for governor received the highest vote at the last general election at which a governor was elected preceding each apportionment. If a candidate for governor of a third political party has received at such election more than 25 percent of such gubernatorial vote, the commission shall

consist of 12 members, four of whom shall be selected
by the state organization of the third political party.
One resident of each of the following four regions
shall be selected by each political party organiza-
tion: (1) the upper peninsula; (2) the northern
part of the lower peninsula, north of a line drawn
along the northern boundaries of the counties of
Bay, Midland, Isabella, Mecosta, Newaygo and
Oceana; (3) southwestern Michigan, those counties
south of region (2) and west of a line drawn along
the western boundaries of the counties of Bay,
Saginaw, Shiawassee, Ingham, Jackson and Hills-
dale; (4) southeastern Michigan, the remaining
counties of the state.

[2]
"No officers or employees of the federal, state or
local governments, excepting notaries public and
members of the armed forces reserve, shall be eligi-
ble for membership on the commission. Members
of the commission shall not be eligible for election
to the legislature until two years after the apportion-
ment in which they participated becomes effective.

[3]
"The commission shall be appointed immediately
after the adoption of this constitution and whenever
apportionment or districting of the legislature is
required by the provisions of this constitution.
Members of the commission shall hold office until
each apportionment or districting plan becomes ef-
fective. Vacancies shall be filled in the same man-
ner as for original appointment.

[4]
"The secretary of state shall be secretary of the
commission without vote, and in that capacity shall
furnish, under the direction of the commission, all
necessary technical services. The commission shall
elect its own chairman, shall make its own rules of
procedure, and shall receive compensation provided
by law. The legislature shall appropriate funds to
enable the commission to carry out its activities.

[5]

"Within 30 days after the adoption of this constitution, and after the official total population count of each federal decennial census of the state and its political subdivisions is available, the secretary of state shall issue a call convening the commission not less than 30 nor more than 45 days thereafter. The commission shall complete its work within 180 days after all necessary census information is available. The commission shall proceed to district and apportion the senate and house of representatives according to the provisions of this constitution. All final decisions shall require the concurrence of a majority of the members of the commission. The commission shall hold public hearings as may be provided by law.

[6]

"Each final apportionment and districting plan shall be published as provided by law within 30 days from the date of its adoption and shall become law 60 days after publication. The secretary of state shall keep a public record of all the proceedings of the commission and shall be responsible for the publication and distribution of each plan.

[7]

"If a majority of the commission cannot agree on a plan, each member of the commission, individually or jointly with other members, may submit a proposed plan to the supreme court. The supreme court shall determine which plan complies most accurately with the constitutional requirements and shall direct that it be adopted by the commission and published as provided in this section.

[8]

"Upon the application of any elector filed not later than 60 days after final publication of the plan, the supreme court, in the exercise of original jurisdiction, shall direct the secretary of state or the commission to perform their duties, may review any final plan adopted by the commission, and shall remand such plan to the commission for further action if it

fails to comply with the requirements of this constitution."

Before us remain (all others are withdrawn) but two proposed plans of legislative apportionment. They and all others were filed unilaterally without precedently authorized leave of the Constitution; also without *recorded* leave of Court until the majority order of February 9 was issued upon Court-asserted strength of the presently mentioned, wholly counterfeit and since withdrawn Hughes (Democratic) plan.[8] Each of these remaining plans is designed for prospective bicameral effect until the census of 1980 is counted and made "available", and thereafter until all proceedings required by § 6 are concluded.

One of the two remaining plans is the creation of the Republican half of the constitutional Commission. It was formally submitted to the Commission and voted down by the usual four-four vote on January 28 last. There can be little doubt now that when the constitutional Commissioners met last on January 28, and when the Democratic half of the Commission decided to come here February 1 *ex parte, this Republican plan had the then opponent Democratic plan beaten for constitutional quality.*

The other is the February 18 filed creation of the Democratic half of the constitutional Commission.

---

[8] This Hughes plan was on its face a hurried-in sham to gain time. On that face it was constitutionally insufficient for want of compliance with the basic requirement of *Reynolds* v *Sims* (quoted *supra*). The fact was confessed on the first page of the petition that accompanied the Hughes plan to this Court:

"I am submitting to the Court, at this time an apportionment plan identified as Senate Plan 19 and House Plan 13, which sacrifices equality of population in order to maintain intact a greater number of boundaries of political subdivisions within the State of Michigan."

The Hughes plan was formally withdrawn from judicial consideration by Democratic Commissioner Kleiner during oral argument March 6.

*That plan was never submitted to the Commission at any time.* It was delayed of filing with our clerk until late on February 18, a Friday. That date, of pure coincidence of course, happened to be the last day allowed for the filing of plans with our clerk; a date which the Court's majority had fixed by its order of February 9.

By this curiously arranged judicial procedure, what competitively equal opportunity did the Republican four ever have, before this Court, paragraph 7 considered? The political game having been started February 1 with the invalid filing of an invalid plan which the filers thereof knew could not be approved under paragraph 7; and the Court having granted the Democratic four nine days more within which to come up with a plan equaling or exceeding in constitutional quality the theretofore superior Republican plan; and the Democratic four having filed their new plan so late on the last day of the extended period that the Republican four had no opportunity whatever to examine that new plan in order to meet it, if possible, with compensatory amendments of their own plan; and the Court having decided *not* to "remand this cause to the Commission for further proceedings",[9] it is perfectly obvious that the Republican four have been subjected to that kind of "sudden death" extension of a contest during which one team only, by dictate of the referee, is to have possession of the ball. Indeed, the chances of the Republican team under paragraph 7 have been squeezed by the Court to less than those of that wax-legged dog of the parable when he tried to chase the asbestos cat through Hell; a fact that exposes the stark requirement, certainly when that

[9] See the mentioned second paragraph of the majority opinion *ante* p 450), accusing "both political parties" of "political shenanigans" as the opinion proceeds cozily to award the prize to the Democrats.

can be done in ample time for judicious action
headed toward the concurrent elections of 1974, that
each "proposed plan" be submitted precedently to
the Commission as a condition of judicial test there-
of under paragraph 7. The Republican team and
the party represented by it will at least have been
handed an unvarnished message, here and by the
majority judgment already entered in the companion
*UAW* case. It is as Dickens chalked over the door-
way of that Jarndyced old English Court: "Suffer
any wrong that can be done you, rather than come
here!" (Bleak House, p 17).

In the ensuing factual narrative I have found it
both due and appropriate to quote from several
documents disclosing, both directly and circumstan-
tially,[10]  *   *   * that too much of that heady stuff
known as partisan politics has been steamed into
the present proceeding and that this partisan-nomi-
nated Court should disqualify itself in favor of ple-
nary resubmission under § 6 by and before the
*nonpartisan nominated and nonpartisan elected*
Court of Appeals, with that Court sitting en banc by
authority of an order entered pursuant to 1968-
amended § 23 of the judicial article. For the same
motion in the related partisan action, see *UAW et
al* v *Austin,* post, p 549.

*Second: A Chronology of Hotspurred Action*

For late January and the forepart of February
Justice Adams had been appointed acting Chief Jus-
tice by the Chief Justice. But three Justices were
in their offices at the time. They were Justices
Adams, T. E. Brennan and the writer. One Justice
was out of the county temporarily and was expected

---

[10] "Circumstances, which are things, constitute inflexible proofs.
Witnesses may be mistaken, or careless in their use of words,
especially when interested in the judicial result. Circumstances can
be neither. They cannot lie, once they are established." (*Schneider*
v *Pomerville,* 348 Mich 49, 58 [1957]).

back "shortly". Two more were attending legal conventions at New Orleans and Baton Rouge. The fourth was in Connecticut. (So the acting Chief Justice advised when he called the writer about this proceeding on February 3. See his memo to the Justices of February 3; Appendix III, *post* p 487). *Hence no meeting or conference of the Court could have been or was called prior to entry by the acting Chief Justice of the majority order dated February 9* (Appendix IV, *post* p 489), the writer dissenting.[11] Whatever conferential caucus of the majority that took place, between February 1 and February 9 as regards this proceeding, had to be accomplished by long distance. That just isn't the way to handle critically important judicial business, and here we behold the Court's first mistake; that of overlooking or hastily deciding bulging questions of prematurity prior to commitment of the Court to action the statewide political consequences of which *are due now to be of ten years duration.*

It was *not* physically possible, prior to entry of the acting Chief Justice's order of February 9, for the absent Justices to examine in deliberative or other detail that Democratic Hughes' plan as a jurisdictional basis for institution of paragraph 7 judicial action. Finally withdrawn as pointed out above, the Hughes plan consists of 11 pages of a "Petition Submitting An Apportionment Plan For The Michigan Legislature", plus 1–1/4 inch thick detailed appendices, maps, population figures, etc. A careful and

---

[11] The concluding paragraph of that dissent reads:

"I would enter an order advising the constitutional commissioners that they should receive and consider *all plans they wish the Court to examine according to the paragraph 7 test;* further, if unable to agree then, that they should meet for the making of a due and final record of constitutional disagreement. That record with all plans the commission has considered and failed to adopt should then be submitted to this Court as the constitutionally directed basis for paragraph 7 proceedings." (Appendix IV, *post* p 489.

contemplative study thereof would require at least two days of judicially exclusive concentration, some of it necessarily done with the aid of a magnifying glass. If the reader thinks that was done by all of us between February 1 and February 9 as a basis for issuance of the Court's railroaded order of February 9, he just doesn't know us.

Refer now to the acting Chief Justice's rapid-fire memos to the Justices of February 1, February 2 and February 3 (Appendices I, II and III, *post* pp 485–487). The first of these was hurried out, immediately upon filing of the Hughes plan, before anyone thought to ascertain whether the Commission actually had met to pass or adopt any motion or resolution attesting inability to "agree on a plan". The second paragraph of the memo reads, pertinently:

"The Clerk has not as yet received an official notice from the Commission on Legislative Apportionment that it has been unable to agree upon a plan. However, it is understood that such a statement will be received by the Clerk very shortly."

True enough, the acting Chief Justice was expecting an "official notice" *from the Commission,* "All final decisions [of which] shall require the concurrence of a majority of the members of the commission." (From paragraph 5, of § 6.) But to this day the Court has received no word or verified document "from the Commission on Legislative Apportionment that it has been unable to agree upon a plan." Then, with the shot-loaded whip snapping from Detroit toward Lansing, the Democratic Secretary of State tried *nunc pro tunc* to fill the constitutional gap by writing our clerk February 3, unilaterally as follows:

"Disagreement as to the import of the September 17, 1971, motion relative to the time schedule also

caused a motion to adjourn and a motion to adjourn to 9:30 a.m., Friday, February 4, 1972, failed to pass. Consequently, at 12:05 a.m., January 29, 1972, Chairman Goebel adjourned the meeting. No future meeting is scheduled."

I find nothing in the Constitution, and nothing whatever in the "rules of procedure" which the Commission adopted May 14, 1971, which even remotely might be said as authorizing the Secretary of State (a true Democrat of course) to write such a letter as and for support of an allegedly commenced paragraph 7 judicial proceeding. Nor will the reader find anything in § 6 or in the commission's rules that might authorize the institution of a paragraph 7 proceeding in the absence of a "cannot agree" resolution of the Commission itself. The Democratic half of the Commission and in turn our majority have simply plunged ahead, without regard for the constitutional necessity of resolved evidence of final nonagreement *of the Commission* furnished *by the Commission,* knowing full well that the Commission on February 1 still had 127 days left, of its constitutionally allotted 180 days' time, within which to "complete its work". Even now that time-allotment will not expire until June 7 next.

It is sufficient to add that, when the *Commission of 1964* came finally to the point of inability to "agree on a plan", it met, passed and certified to this Court a formal resolution of that constitutional body. And that was done *before* any Commissioner attempted to file a petition or plan here. The resolution:

"Be it resolved that the majority of the Commission on Legislative Apportionment is unable to agree upon a plan for the apportionment of the Michigan legislature as provided in Article IV of the Michigan Constitution."

Can there remain doubt now that this proceeding has been driven ahead of constitutional schedule for partisan advantage, when except for such advantage there has been and is now no need or occasion for such haste?[12]   That there was such need and occasion eight years ago (*In re Apportionment of State Legislature–1964,* 373 Mich 247, 262 [1964]) forms no excuse for present hurry, for then both the Senate and the House elections of 1964 and 1966 were constitutionally due to be conducted *concurrently* and there was at the time no alternative other than a possible breakdown of Michigan's legislative process as this Court waited for the handing down of the *Reynolds* v *Sims* line of decisions (377 US 533–743).

Let me make it plain.   The majority by going along with the "political shenanigans"[13] it loftily deplores has effectively excised paragraph 8 from § 6, throughout the decennial period ahead.   The *fait* having been accomplished this year, and the stalemate of 1965–66 recalled (377 Mich 474, 475), no one could be made to believe that any paragragh 8 proceeding started later this year would have any chance of success.   The very idea of proceeding seriously under paragraph 8 would redden the face of the Court, and that is totally unthinkable.

To summarize this division of discussion I make bold to comment that "the political shenanigans of

---

[12] Ponder the complete fifth paragraph of the acting Chief Justice's February 1 memo (Appendix I):

"As this matter is of some urgency, I would appreciate suggestions from all Justices as to what they think would be a suitable time table, *bearing in mind that there will undoubtedly be considerable pressure for the Court to act as speedily as possible.*" (Emphasis supplied.)

[13] Our majority advises, without looking in the mirror:

"The activities of the political parties during the 1964 Commission on Legislative Apportionment, and the political shenanigans of both political parties making up the Commission this year, as brought out in oral argument before this Court, convinced a majority of the Court that it would be futile to remand this cause to the Commission for further proceedings." (Majority opinion, *ante* p 450.)

both political parties" are not exactly restricted to such parties and the Commissioners appointed by them. It would not be "futile" at all should the Court order that the Commission proceed with its duty, as proposed by the writer February 9, dissenting. It would be "futile" to *remand* with instructions when the Court hasn't the will to enforce them. We saw that happen when a gutless Court wouldn't enforce paragraphs 1 and 2 of its imperative order to the constitutional Commission dated November 2, 1965 (376 Mich 481, 482). For a delicate discussion of that miserable blench from duty, see 377 Mich 408–414.

*Third: The Proper Application of That Paragraph 7 Phrase; "may submit a proposed plan to the supreme court."*

Whether with sanction of paragraph 7 of § 6 this Court could accept jurisdiction of a proceeding which to this day is *in posse* and not *in esse,* and whether the Court under paragraph 7 may now lawfully proceed as if such jurisdiction had been duly invoked, was raised by formal dissent registered when the Court's order of February 9 was issued (Appendix IV, *post* p 489).

That issue has not and will not go away. It searchingly inquires whether the Court was legally and morally right in entering the order of February 9, knowing (a) that the Democratic half of the Commission had turned away from constitutional duty without benefit of clergy or shred of legal authority; (b) had done so more than 4 months prior to expiration of the prescribed 180 day period within which "to complete its work", and (c) had proceeded posthaste to the Court with no plan of its own *yet ready* for paragraph 7 comparison with the Commission-considered Republican plan.

True, our majority recognizes no jurisdictional question. It proceeds instead as if jurisdiction was duly conferred and, having stated what it calls a "procedural problem" this way:

"There is, however, one procedural problem which is present in the Republican's 'Motion to Foreclose' which, as a threshold issue, must be resolved, *viz.*, whether § 6, paragraph 7 requires expressly or impliedly that a 'proposed plan' must have been submitted to the Commission as a condition precedent to submission of the proposed plan to our Court";

airily disposes of it on the basis of unclean hands of the Commission and upon strength of admissions made by members of the Commission, forgetting that all such considerations are quite irrelevant to the judicial determination of *any* proceeding involving, as this one does, not the rights and interests of either or both of the two political parties or their appointees *but those of all of the people of Michigan.* The majority disposition reads:

"As to the 'public policy consideration,' neither party is coming into our Court with clean hands. Both have engaged in partisan maneuvering. Both sides frankly admit they did not pass upon all of the plans submitted to the Commission. This is borne out by the Commission's minutes, which reflect that 19 last hour motions for adoption of plans by the members failed for want of a concurrence of a majority. We hold it was not necessary to submit to our Court only plans previously presented to the Commission."

I prefer to look directly at the merit of the posed question, assuming for the moment that this proceeding is *jurisdictionally* before the Court. Doing so, I find in § 6 that the word "plan" appears only in paragraphs 3, 6, 7 and 8. In paragraph 3 it ap-

pears in the expression "each apportionment or districting plan"; in paragraph 6 it appears in the expression "[e]ach final apportionment and districting plan"; in paragraph 7 it appears in the expressions "agree on a plan", "may submit a proposed plan to the supreme court", "determine which plan complies"; in paragraph 8 it appears in the expressions "after final publication of the plan", "may review any final plan", and "remand such plan".

We start with fundamental knowledge that "proposed", being *alone* in *entire* § 6, was put in paragraph 7 before "plan" for a definite purpose. If it was intended to permit submission to the Court of a "plan" *not* "proposed" to the Commission, would not the scriveners have written simply "a plan", or "any plan", or "any proposed or new plan"? Would not the electors *then* have understood definitely that the purpose was to permit what now is declaredly approved *dixi* by the Court, that is, submission on the late afternoon of a deadlined date of a plan put together *after* commencement of the judicial proceeding? As paragraph 7 reads, would not the electors have assumed understandably that "a proposed plan" meant any plan *proposed* before the Commission and *then* brought here?

Our now settled rule of "common understanding" applies here. Witness *Traverse City School District v Attorney General,* 384 Mich 390, 405 (1971):

"The primary rule is the rule of 'common understanding' described by Justice COOLEY:

" 'A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.* "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,*

and it is not to be supposed that they have looked for
any dark or abstruse meaning in the words employed,
*but rather that they have accepted them in the sense
most obvious to the common understanding,* and rat-
ified the instrument in the belief that that was the
sense designed to be conveyed." (Cooley's Const
Lim 81).' (Emphasis added.)"

Bearing in mind that the sole purpose of § 6 is
that of making the Commission the *exclusive* appor-
tioner and districter of the legislature every ten
years, with reviewing and enforcing supervision—
that only—vested in and with this Court, I conclude
that "proposed" was put in the text of paragraph 7
for this precise purpose; that of restricting submis-
sion to the Court under paragraph 7 of a plan or
plans theretofore proposed to the Commission and
turned down there, subject only to the inherent
power of this Court to act decretally *should* there
be some emergency or other equitably justifying
reason for delayed filing of a plan not previously
proposed to the Commission. That indeed did
occur during the crisis that developed in May of
1964,[14] to which I now refer.

As this Court continued its vigil of February 4,
1964 (372 Mich 418–482) through June 22, 1964 (373
Mich 247–262), awaiting release of the mentioned
*Reynolds* v *Sims* line of cases, and as the Court faced
question whether for want of time there might be an
interregnal breakdown of the state government for
want of a *constitutional* election in 1964 of Mich-
igan's Senate and House of Representatives, then
and now Commissioner A. Robert Kleiner petitioned
the Court "for leave to file a districting and appor-
tionment plan for the Michigan legislature, attached

---

[14] For an excellent analysis of the constitutional predicament as
it stood at the time, see Justice SOURIS under date of June 24, 1964
(373 Mich 257–262).

hereto and identified as Exhibit 1, as an alternate
to the plan submitted to this Court in this matter
by Commissioners Austin and Kleiner on February
14, 1964." The petition was replete with urgent
good reason for grant of leave requested, the out-
and-out uncertainty of validity — under the Four-
teenth Amendment — of portions of §§ 2, 3, 4 and 5
of Michigan's legislative article considered.

In view of the fact that the petition came in ample
time for consideration of the proffered alternate
plan by the then Republican half of the constitu-
tional Commission, and since the emergent need for
paragraph 7 consideration of the alternate plan was
made amply clear to us, this Court by unanimous
order dated May 13, 1964 granted the petition. Thus
came into being the alternate plan which, reviewed
in conjunction with the rules subsequently laid down
in the aforesaid *Reynolds* v *Sims* line of cases, was
ultimately approved under paragraph 7 as the basis
for the Senate and House elections of 1964.

*To Conclude:*

1. The accusation of "political shenanigans", made
in the quoted second paragraph of the majority
opinion, tells volumes. The majority seems to look
on a paragraph 7 proceeding, whether it be pre-
mature or timely, as a contest between Republicans
and Democrats. But when properly instituted such
a proceeding brings to Court the exalted test of *a
people's superior right,* regardless of any and all
such "shenanigans", to the careful deliberation by
all Justices of the ten-year destiny of their state's
bicameral legislature. If there ever was a proceed-
ing where political considerations — "shenanigans"
and all — should be brushed aside, this is it. Sadly,
that is not to be.

2. Respect for that prim reminder which the Su-
preme Court handed this Court in 1955 (*In Re*

*Murchison,* 349 US 133, 136; 75 S Ct 623; 99 L Ed 942), "A fair trial in a fair tribunal is a basic requirement of due process", should have suggested immediately that a mere jot of leaning over backward, by the dedicated Democratic Brethren, was definitely in order so that all *appearance* of partisanship might be scrupulously avoided. But as matters have turned out the process that was due all persons and parties represented at bar, and more so the process that was due *all of the people of all Michigan,* has been denied patently by the Court's judgment of May 4, however artlessly that may have been done.

3. As in the companion *UAW* case, nothing written above is to be taken as a Republican brief. Some pretty fair reasons were supplied by dissent in the *UAW* case for concluding that, were the political situation reversed, no one could or would entertain honest doubt that the majority of Republican nominees to the Court "would be just as stubbornly party-inclined as are today's four Democratic nominees." [15] Reference to that dissent is respectfully made with observation that each of the two proceedings, coming here concurrently as they have, were filed in our clerk's office *by the same complaining litigant,* that is, *the Democratic party of Michigan.* That party has succeeded signally in both instances, all the way

[15] These twin dissenting opinions inveigh, not against any partisan nominee to the Court, but rather against what has to be the most sordid system of judicial selection that is known anywhere in the United States. Every two years our personnel changes regularly by means of controlled partisan nominations, followed by the pretense of "nonpartisan" elections of two and occasionally one Justice. The situation parallels exactly that which Judge Higbee lamented in the corresponding redistricting case of *State ex rel Lashly* v *Becker,* 290 Mo 560, 235 SW 1017, 1041 (1921):

"Shackled as we are with partisan bias and prejudice, it is humiliating to confess that even judges in our highest courts are unable to divorce law and politics. In emergencies, great and small, they have heard the Macedonian cry, and have not been disobedient to the call."

through, upon unitary vote of four Democratic nominees to the Court.

　　·　　·　　·　　·　　·　　·　　·　　·

I would enter an order advising the constitutional Commission as proposed by the concluding paragraph of my dissent against issuance of the Court's order of February 9 (Appendix IV, *post* p 489).  As correspondingly recommended for the companion *UAW* case I would enter another directing that the Court of Appeals be assigned *en banc* to Supreme Court duty under amended § 23 of the judicial article, the specific assignment to be that of hearing and determining all proceedings rightfully instituted under paragraphs 7 and 8 of said § 6 and arising out of the now counted decennial census of 1970.

## APPENDIX I

(February 1, 1972 memo of Acting Chief
Justice ADAMS to the other Justices)

February 1, 1972
To: The Justices
From: Paul L. Adams
　　　　Acting Chief Justice

*In re: Apportionment Plan for the Michigan Legislature*
Edwin P. Hughes, a member of the Commission on Legislative Apportionment, has submitted to this Court an apportionment plan.

The Clerk has not as yet received an official notice from the Commission on Legislative Apportionment that it has been unable to agree upon a plan.  However, it is understood that such a statement will be received by the Clerk very shortly.

On February 6, 1964, when we had The Matter of the Reapportionment of the Michigan State Leg-

islature before us, Chief Justice Thomas M. Kavanagh issued an order, copy of which is attached to this memo.

It would appear to me that the first order of business, as soon as the matter is officially before us, would be to issue a similar order setting dates for members of the Commission to petition the Court submitting their plans, submitting objections to any other plans, and fixing a date for members of the Commission, or their attorneys, to make an oral presentation of their plans, or their objections to other plans, to the Court.

As this matter is of some urgency, I would appreciate suggestions from all Justices as to what they think would be a suitable time table, bearing in mind that there will undoubtedly be considerable pressure for the Court to act as speedily as possible.

With a view to affording the Justices as much assistance as possible in absorbing and digesting the several plans which I anticipate will be submitted, I have instructed the Clerk to request Commissioner Greenia to prepare a Special Report to the Court on such plans as are submitted. Copies of the plan submitted by Edwin P. Hughes are presently on file. The Clerk has one and the other one was left with me. [Here follows the proposed form of order.]

## APPENDIX II

(February 2, 1972 memo of Acting Chief Justice Adams to the other Justices)

February 2, 1972
To: The Justices
From: Paul L. Adams
       Acting Chief Justice

*In re: Apportionment Plan for the Michigan Legislature*

Supplementing my memo of yesterday with regard to the above matter, I wish to explain further that the assignment to Commissioner Greenia to prepare a Special Report is a special assignment for the purpose of having a preliminary report before us when this matter is heard.

Since I would assume that we would be hearing this matter either during our March term or thereabouts, I felt it was desirable that some arrangement be made for a preliminary digest of the material to assist us in going over it.

## APPENDIX III

(February 3, 1972 memo of Acting Chief Justice ADAMS to the other Justices)

February 3, 1972
To: The Justices
From: Paul L. Adams
Acting Chief Justice

*In re: Apportionment Plan for the Michigan Legislature*

The Court has now received notice from the Secretary of State that the Commission on Legislative Apportionment has been unable to agree upon district plans for the State Legislature. Copies of the letter are being circulated by the Clerk to the Justices.

I have discussed time problems with Bernard Apol, Director of the Elections Division. The crucial deadline is June 20, 1972, which is the final date for candidates to file petitions for election to legislative office. For a new plan to be in effect on that date, it would have to be published 60 days before June 20, or April 21, 1972. This, of course, is the

ultimate date and actually publication should occur not later than April 14 or 15. Before publication can occur, this Court must decide upon a plan and "direct it be adopted by the commission and published." Once a plan is adopted by the Court, it would be necessary to have an interval of at least three days, preferably more, to convene the Commission and allow the Commission time to take steps to have the plan published. This means that if a new plan is to be adopted for the 1972 elections, this Court is faced with a deadline on or about April 10 or 11 to decide upon a plan.

In view of the foregoing, I think it is quite apparent that if we are to proceed with due dispatch with this matter, it is essential that a hearing be scheduled for early March. I have checked with as many of the Justices or their secretaries as I have been able to reach and it appears that the schedules of all of the Justices, as far as I have been able to ascertain, are clear so that this matter can be heard on March 6 at 2:00 p.m. This is the Monday before we will begin to hear cases and should be a convenient time for all of the Justices to convene instead of convening on the following Tuesday morning.

understand that there is a possibility that he may have some objections to the entry of such an order and, of course, there may also be objections by other Justices whom I have been unable to reach. If a majority of the Justices signify their approval of the proposed order, I will enter it at noon on Tueswas entered on February 6, 1964 by Justice Thomas

Attached hereto is a proposed order promulgatorder is practically a carbon copy of the one that M. Kavanagh. There is even very little change as to the dates.

After talking with Justice Black this morning, I ing procedures for the hearing on March 6. The

day, February 8, with whatever dissenting Justices
may wish filed at the same time.

If the majority are unable to agree on the pro-
posed order, it, of course, will not be entered and
we will have to proceed from there.   [Here follows
the proposed form of order.]

### APPENDIX IV

(Supreme Court order of February 9,
1972, "Promulgating Procedures for Pro-
ceedings to be had under the seventh
Paragraph of Section 6, Article IV of
the Michigan Constitution of 1963.)

A petition submitting a proposed apportionment
and districting plan for the Michigan Legislature
having been filed with this Court by Edwin P.
Hughes, one of the Commissioners on Legislative
Apportionment, under section 6 of Article IV of
the Michigan Constitution of 1963, IT IS ORDERED
BY THE COURT AS FOLLOWS:

Members of the Commission on Legislative Ap-
portionment are advised that each member individ-
ually or jointly with other members may petition
the Court on or before February 18, 1972, pursuant
to the provisions of the seventh paragraph of sec-
tion 6, Article IV of the Michigan Constitution of
1963, for its consideration of and action upon a pro-
posed apportionment and districting plan.

Any other member or members of the Commis-
sion may file with the Court written objections to
any such plan on or before February 25, 1972.

Petitions, objections thereto, and other pleadings
or documents, shall be printed, multilithed or mimeo-
graphed on paper no larger or smaller than 8-1/2
by 11 inches, 20 copies of each to be filed with the
Clerk of the Court, and 2 copies to be served forth-
with upon each other member of the Commission,

proof of such service to be filed promptly with the Clerk.

Members of the Commission desiring to appear before the Court in person or by attorney on March 6, 1972, at 2:00 p.m., for oral presentation of their plan or their objections to other plans submitted to the Court, shall file written demand therefor with the Clerk of the Court on or before February 25, 1972.

BLACK, J. dissenting:

For a court with a mighty poor track record of timely decision, made from and after submission of calendar causes and original actions, I must say that the foregoing order exhibits the dazzling speed of a regularly slow but lately dexedrine-doped race-horse. Too, the order reminds poignantly of our corresponding experience in 1964, referring to majority suspension for stated good reason of proceedings under paragraph 7 of section 6 of the legislative article; all highlighted by Justice Adams' now immortalized observation* that he did not "conceive it to be the proper duty or function of this Court to attempt to outrun the Supreme Court of the United States." I rejoin in paraphrase that it is not in this year 1972 the proper duty or function of this Court to attempt to outrun, and thereby evade, *any* of the provisions of mentioned section 6, partisan pressures to the contrary notwithstanding.

In the light of the Court's headlong haste to set up a timetable for wholly premature political-judicial action it does not seem to matter that few of us as yet have been given opportunity to even read—much less contemplate—the paragraph 7 materials that were tossed into the clerk's office last week and distributed to all here by February 4, or

---

* *In re Apportionment of Legislature,* 372 Mich 473; echoed unanimously in *People* v *Woods,* 382 Mich 129 (1960).

that there simply isn't time left for nonpartisan as
well as intellectually honest *full* compliance (with
section 6) in time for any legislative election this
year, or that the constitutional commission hasn't
bothered *thus far* to meet as in 1964 for formal
report to the Court that "a majority of the commis-
sion cannot agree on a plan," or that the action
of the Court scheduled and forecast by the forego-
ing order is bound to accomplish the patently un-
constitutional *fait* of a legislature half of which has
been redistricted, reapportioned and elected with
the other half left politically intact.

This time there is no constitutional emergency
and no need or excuse for galvanic arousal of the
Court, as there was between May 26 and June 17
of 1964, when the Court waited week by week for
decision by the United States Supreme Court of
the *Reynolds* line of cases. Nor is this Court now,
as it was in 1964 and 1966, possessed of the employ-
able benefit of section 5 of the constitutional sched-
ule. At that time the Court was permitted to ap-
prove a "plan", under paragraph 7, for application
to *simultaneous* 1964 and 1966 elections of members
of both houses. That cannot be done now. Did
not said section 5, employing "notwithstanding"
language, mandate election of the senate in 1964
for a 2-year term, thus requiring that the 1964 and
1966 senate and house elections take place concur-
rently but not thereafter?

Of course the real objection to the Court's hot-
spurred drive to "determine which plan complies
most accurately," in time for the House election this
year, is that such action with its politically sly fore-
thought will cut off all opportunity of exercise of
this Court's original jurisdiction under paragraph
8 of said section 6; also that it is bound to result in
the 1972 election of a newly apportioned and dis-
tricted House with an already four-year elected

Senate left untouched. Now who wants to say, right out in our reports, that anyone ever contemplated any such schemed antics of partisan politics when the Constitution of 1963 was submitted to and approved by the People?

I would enter an order advising the constitutional commissioners that they should receive and consider *all plans they wish the Court to examine according to the paragraph 7 test;* further, if unable to agree then, that they should meet for the making of a due and final record of constitutional disagreement. That record with all plans the commission has considered and failed to adopt should then be submitted to this Court as the constitutionally directed basis for paragraph 7 proceedings.

T. G. Kavanagh, J. (*dissenting*). This matter comes to us under that provision of Const 1963, art 4, § 6 which reads:

"The supreme court shall determine which plan complies most accurately with the constitutional requirements and shall direct that it be adopted by the commission and published as provided in this section."

We are not asked to determine whether the present apportionment of the Michigan Legislature is valid. If we have any function at all, it is to determine which of the plans submitted by the commission "complies most accurately with the constitutional requirements" and order its adoption.

Because I am persuaded the provisions of art 4 which would place this responsibility on us are invalid as in contravention of the US Const, I conclude that we have no proper function at all in the premises.

As written, § 6 created a commission consisting of representatives of some political parties to ap-

portion the legislature after each decennial census according to a method relating population and territory in a specified ratio.

When the United States Supreme Court in *Reynolds* v *Sims,* 377 US 533; 84 S Ct 1362; 12 L Ed 2d 506 (1964) struck down nonpopulation factors in apportionment it became apparent art 4 could not stand as written.

I agree with Justice Souris who said in *In re Apportionment of Legislature,* 373 Mich 247, 258 (1964):

"Having concluded that the apportionment and districting provisions for both the senate and house of representatives were violative of the Fourteenth Amendment, it was my conclusion  *   *   *  that section 6 of article 4 which established the commission  *   *   *  likewise had to be held void.  Section 6, in my view, was so dependent upon the continuing validity of the preceding sections by which the commission's duties were specified and expressly limited, that it could not survive alone."

I too am convinced that the parts are not severable and that § 6's commission fell with the prior provisions of art 4.  But since all of my colleagues would simply prune the unconstitutional limitation from the commission and thus accord life to a commission not defined by the people, it is necessary to examine the commission they would create.

As I view it, even this cannot stand.

The commission described in § 6 is an apportioning agent comprised of representatives of political parties.  To be sure the people are under no constraint to select such an apportioning agent.  They could have selected a single officer to perform the task or provided for a committee to be selected by the Governor or provided for any other nonrepresentative group.  But when they did seek to create

a representative group for this work they were obliged to observe the constitutional requirement that if a class be recognized there may be no legal discrimination in favor of part of that class. *Skinner* v *Oklahoma,* 316 US 535; 62 S Ct 1110; 86 L Ed 1655 (1942).

The provision in § 6 requiring a third party to receive more than 25% of the Gubernatorial vote in order to obtain representation on the commission and making no provision for representation for other parties receiving less than 25% but still representing a significant number of voters, is invidious discrimination offensive to both the First and Fourteenth Amendments. *Williams* v *Rhodes,* 393 US 23; 89 S Ct 5; 21 L Ed 2d 24 (1968).

There is no valid commission under art 4 and hence there is no need to review their work. Indeed it is wholly improper.

To decide this case as presented to us and to select *any* of their plans is to make a political decision. In this setting the parties do not come to this Court asking for justice—they ask for a campaign issue.

It is difficult to conceive of anything better calculated to undermine public confidence in this Court and destroy our credibility.

Today this is a tragic error of the first magnitude.